THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KEVIN O'CONNOL, Defendant-Appellant.

Third District    No. 80-423

Opinion filed July 28, 1981.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STOUDER delivered the opinion of the court:

The defendant, Kevin O'Connol, appeals from an order of the Circuit Court of Peoria County finding him guilty, after a bench trial, of the offense of the unlawful delivery of a substance represented to be a controlled substance, and sentencing him to a 20-month period of probation. The only issue raised is whether he was proved guilty beyond a reasonable doubt. It is the defendant's contention that there was no proof he ever represented the tablets to be or to contain controlled substances.

At the trial, forensic scientist Steven Hampton was the first witness to testify on behalf of the State. Hampton analyzed People's exhibit 2A, which he described as a white tablet with serrated grooves on one side which appeared to be a cross, and stated the pill contained the non-scheduled substance known as ephedrine. Based on his training and experience the witness stated he has been taught to look for the presence of amphetamines in pills such as this. He testified that there was a set procedure at the laboratory such that one would expect to find amphetamine in pills like the ones delivered by the defendant unless there were certain physical characteristics dissimilar from sample pills kept by him for reference. The particular pills delivered by the defendant were only dissimilar to those sample pills when examined under a 30-power microscope. He conceded, however, that the majority of pills with white crosses on them do not, in fact, contain amphetamines.

A second forensic scientist, Susan Johns, testified she performed a chemical analysis on the tablets contained in People's exhibit 3A and

concluded that those tablets contained no controlled substance. The tablets themselves were described as being small, white, circular shaped with a cross imprinted on one side. Although amphetamines are frequently found in such tablets, Ms. Johns indicated this was not true in each and every instance, and she could not say whether a controlled substance was found in a majority of the cases. She had heard the term white cross, and on prior occasions, her tests of similar-looking pills indicated that some of those pills contained amphetamine.

The next witness for the State was Officer Terry Ziegenbein. Ziegenbein stated he received People's exhibit 2A from Mary Knoll (Stambaugh) on August 17, 1979. Based on his experience as an under-cover agent for the Multi-County Narcotics Enforcement Agency, he testified that the terms white cross, mini-whites, and speed all referred to amphetamines. He testified that every time he hears someone refer to a pill as a white cross, it automatically means to him that the pill contains amphetamine. Finally, he testified that only in his undercover purchases has he heard amphetamines referred to as mini-whites. However, in the 20 or 25 cases he was involved with dealing with white tablets with crosses on them, approximately 50-60% proved not to be amphetamines.

George Pinkney, another undercover officer assigned to the Multi-County Narcotics Enforcement Group, testified that in his experience the term white cross indicated an amphetamine, as did the terms mini-whites and speed, although in his experience the majority of cases involving white cross tablets did, in fact, turn out to be amphetamines. He was personally involved in the seizure or purchase of like pills on 10 or 12 occasions, and in only the case at bar and one other case did the pills not contain amphetamine. He also testified that the normal selling price of 100 doses or "hits" of amphetamines was $20. Pinkney conceded that the term white cross could merely be descriptive of the pill without necessarily referring to what it contained.

Mary Ann Knoll Stambaugh, an undercover officer, was the State's principal and final witness. Stambaugh testified that while working for Caterpillar she became acquainted with the defendant. She was the agent who actually purchased the pills from the defendant. On August 17, 1979, at 5 a.m., the defendant asked her if the white cross he had given her earlier was any good. When she replied that it was, he said he had more and gave her another tablet. He also stated he might be able to get "100 hits for $20" the following week. This conversation took place at the Caterpillar plant in Mapleton, Illinois, where both parties worked.

She again talked to the defendant on September 11, 1979, at approximately 7:30 a.m. At that time the defendant invited the agent to go to a car in the parking lot and "get high" with him and another individual. And on September 12, 1979, the defendant told her he could get some

more white cross, but before he would sell it to her she would have to sign a statement that she was not a police officer or working undercover in any capacity with any other agency or for Caterpillar.

On January 11, 1980, at Butler's Tap, Stambaugh saw the defendant at approximately 9:30 a.m., and he indicated he could secure additional white cross. He left the bar and returned 20 minutes later. The two, then, went to Stambaugh's car at which time the defendant handed her a bottle containing 1000 white cross tablets. The defendant removed 100 of the tablets for himself and tore off part of the label on the front of the bottle. The defendant stated that he tore part of the label off because he did not want everybody to know where the company was. The witness stated, however, she saw the term mini-whites written across the front of the label. Stambaugh paid the defendant $95 for the remaining tablets (People's exhibit 3A). Finally, she testified that the defendant asked her several times if she was a "narc."

During cross-examination, Stambaugh testified that O'Connol never referred to the tablets as anything but white cross. He never referred to the tablets as, or otherwise used the terms, speed or amphetamine. The witness also noted that the term white cross could just as easily have been used as a descriptive term for the pills. Defendant's exhibit 1 was identified as the statement she filled out and signed at the defendant's request.

In addition, the agent's official police report relating the details of the January delivery included no reference to the defendant's act of tearing off part of the label. She defended her omission by explaining that she felt the defendant's act was not important enough to include.

Stambaugh continued her testimony by stating she was aware of the rule at Caterpillar which prohibits private businesses from operating on the premises and failure to comply with this rule could result in the discharge of an employee. It was also true that the defendant never asked her to sign any statements until their relationship had changed from his simply giving her several pills to the point where the quantity she wanted forced him to sell them to her.

At this point, the State rested its case, and defense counsel moved to dismiss both counts of the indictment. The court granted the motion as to case 80—CF—1143 (the August 17, 1979, transaction) but denied it as to 80—CF—1149 (the January 11, 1980, transaction).

The defense then presented its case which consisted solely of the testimony of the defendant, Kevin O'Connol. The defendant identified defendant's exhibit 1 as the sheet of paper he asked undercover agent Stambaugh to sign. At the time Stambaugh, apparently known to defendant as Mary Knoll, had asked to purchase mini-whites from O'Connol. At first, he would simply give two to three of them to her without cost. This

was repeated a number of times. However, over a period of some weeks she asked, on several occasions, to purchase some. At this point, the defendant indicated she would have to sign a paper indicating she was not an officer. He testified that the woman had been showing police identification cards to several other people in the plant, and he was concerned about Stambaugh's status because things had been missing from the plant. The specific reference in the document disclaiming that she was working undercover for Caterpillar was because of the small business rule in effect at the plant which prohibited selling of any type. The witness indicated he was aware of people who had been fired based on this rule. When Stambaugh signed the statement, the defendant was suspicious that she was lying about not being an undercover agent for Caterpillar, and because the defendant was concerned about keeping his job, he specifically declined to sell any items to Stambaugh on Caterpillar property.

The defendant stated he had in fact sold the agent the contents of People's exhibit 3A for a total of $95. The label on the container indicated the tablets enclosed were mini-whites, gave the name of a pharmaceutical company, and indicated the fact that the pills were not a controlled substance. When the agent asked if the pills were amphetamines he responded, he did not know anything about that. Instead, he represented them to be mini-whites. The defendant testified that he did not remove a portion of the label. When he left Stambaugh, the label was on the package.

The defense at this point rested its case and following closing arguments the court found the defendant guilty as charged in the remaining count. On July 11, 1980, a hearing on post-trial motions and sentencing was held. Defense counsel again argued, as he had throughout trial, that the defendant was not proven guilty beyond a reasonable doubt since there was no evidence presented of the defendant having ever represented the pills he sold to be a controlled substance. The court denied the motion and entered a judgment of conviction.

■■■ To establish the defendant's guilt beyond a reasonable doubt, the State need only prove that the defendant knowingly delivered a substance and knowingly represented the substance to be a controlled substance. (*People v. Kent* (1977), 49 Ill. App. 3d 1030, 365 N.E.2d 239.) However, an express denomination of the controlled substance by the defendant need not be established. The evidence is sufficient if the trier of fact can reasonably find a common understanding between the defendant and the undercover officer that the substance being sold was a controlled substance. *People v. Sanderson* (1977), 48 Ill. App. 3d 472, 363 N.E.2d 180.

■■ In the case at bar, the evidence is sufficient to establish the defendant's guilt beyond a reasonable doubt. Even though not all white cross tablets contain amphetamines, the circumstances surrounding the trans-

action indicate a mutual understanding between the agent and the defendant that the substance being sold was a controlled substance.

First, there are white cross tablets which contain amphetamines, and "white cross" or "mini-whites" are street terms for amphetamines. The defendant consistently referred to the tablets as "white cross." According to the agent, the defendant also referred to the pills as "hits" and invited her on one occasion to "get high."

Second, the defendant made a sale to the agent at the going street rate for amphetamines at a location other than on Caterpillar property after attempting to ascertain whether Stambaugh was a police or Caterpillar agent. While the defendant tried to explain away the written statement he required of Stambaugh, his explanation seems implausible, and there is no requirement that the trier of fact accept his explanation. Even after the transaction, the defendant continued to ask Stambaugh if she were a "narc" even though, according to his testimony, the defendant knew she was a police officer. In short, the defendant's actions do not appear to be logically consistent with his explanation.

■■ Third, in making the sale, the defendant tore off the label on the container. Although the defendant testified he did not tear off the label, he did say the label identified the contents as not being a controlled substance. Since the tablets contained, in fact, no controlled substance, the defendant's tearing of the label would not be consistent with the defendant perpetrating a deception on the purchaser and, therefore, consistent with an understanding between the agent and the defendant that the tablets were to contain a controlled substance. The trial court could well have believed the agent and disbelieved the defendant as to whether the defendant tore the label. The trial court is in a much superior position to this court with regards the ascertainment of witness credibility, and a reviewing court will not substitute its judgment for that of the trier of fact on questions of the weight to be accorded evidence or the credibility of witnesses. See *People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.

For the foregoing reasons, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

SCOTT, P. J., and BARRY, J., concur.