THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BERNARD WILLIAM JOHNSON, Defendant-Appellant.

Third District   No. 81-412

Opinion filed June 18, 1982.

Dennis A. DePorter, of Braud, Warner, Neppl & Westensee, Ltd., of Rock Island, for appellant.

Warren T. McNeill, State's Attorney, of Monmouth (Gary F. Gnidovec and John X. Breslin, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE SCOTT delivered the opinion of the court:

An information was filed in the circuit court of Warren County charging the defendant, Bernard William Johnson, with the unlawful delivery of a substance which he had represented to be a controlled substance, in violation of section 404 of the Controlled Substances Act. (Ill. Rev. Stat. 1979, ch. 56½, par. 1404.) Following a jury trial, the defendant was found guilty and sentenced to a one-year term of probation. He presents two issues for review: whether the testimony of the prosecution's principal witness was so incredible as to raise a reasonable doubt of his guilt, and whether the prosecution proved beyond a reasonable doubt that the defendant had represented the delivered substance to be a controlled substance. We affirm.

The prosecution's principal witness was Jill Bottom, an undercover police agent attached to the Multi-County Enforcement Group (MEG). She gave the following testimony which served as the basis for the defendant's conviction. Agent Bottom entered the North Forty Tavern in Alexis, Illinois, at approximately 4:30 p.m. on January 11, 1980. She played pool with some patrons while drinking soft drinks. At about 9 p.m., the defendant, who was then unknown to the agent, approached her at the bar and introduced himself as Bernie. They drank and talked. Their conversation eventually settled on the topic of drugs. The defendant mentioned that he and another person had recently gone to Cuba, Illinois, to purchase "a couple thousand hits of white cross." Once there, however, the defendant learned that instead of white cross, the seller had "yellow pharmaceutical speed," which he sold the defendant. The defendant boasted to the agent that the speed was "clean and very good," claiming that only two hits were necessary to "get off." Then, upon returning from the men's room, the defendant handed Bottom two tablets of the alleged pharmaceutical speed. He advised her to try those tablets, and, if she needed more, he offered to sell her as much as she wanted. They continued to talk, and the agent left at about 10:30 p.m. The defendant was not arrested until September 1980, nine months after the alleged delivery.

At trial the agent testified that she interpreted the defendant's reference to speed as meaning amphetamine, a controlled substance. She also interpreted the defendant's reference to "yellow pharmaceutical speed" as meaning that the tablets which he had delivered to her were high quality, clean or pure amphetamines. He had vouched for its potency by claiming that only two tablets were necessary to "get off" or

become affected by it. The prosecution stipulated that the two tablets were analyzed and contained no controlled substances. On cross-examination, Bottom admitted that after she had met the defendant she began to drink wine and consumed three glasses by the time she left. She also explained her statement at the preliminary hearing that she had first entered the tavern at 6 p.m. by saying that she had frequented the tavern so often that she had mistaken at the preliminary hearing the time of her arrival on January 11.

The defendant in his case in chief first introduced several character witnesses who vouched for his good character and reputation. He also introduced the testimony of several so-called occurrence witnesses. One witness testified positively that the defendant was not in the tavern on January 11, yet the witness admitted that she was not even present at the tavern on that date. Another witness said that the defendant was present that night but that the accused had not spoken to agent Bottom. The defendant then assumed the witness stand. He admitted that he talked with agent Bottom that night for no more than 10 minutes. According to the defendant, the agent introduced herself as a student from Macomb and offered to buy speed from him. He denied telling her that he had purchased thousands of tablets of yellow pharmaceutical speed from a seller in Cuba, Illinois. He also denied handing the agent any tablets. Finally, the defendant refuted Bottom's testimony that on January 11 he wore a flannel shirt. The defendant's wife and mother both corroborated that portion of his testimony.

■■ The defendant first argues that agent Bottom's testimony was so wrought with inconsistencies and was so well controverted by the defendant's evidence that a reasonable doubt as to his guilt exists. We disagree and find her testimony positive and credible.

Within the trier of fact's nearly exclusive province lie several responsibilities: the resolution of inconsistencies or discrepancies in witnesses' testimony; the determination of bias or interest which diminishes a witness' credibility; and the weighing of each witness' testimony. When the trier of fact renders a decision based upon credible and substantial evidence which is sufficient to convict, the verdict may not be lightly set aside merely because the trier of fact chose to believe the testimony presented by the prosecution rather than that presented by the accused. Accordingly, a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of evidence or credibility of the witnesses, and it will not reverse a finding of guilt unless the evidence is so improbable as to raise a reasonable doubt of guilt.

When the defendant's objections are seen in the foregoing analysis, we must conclude that they are utterly devoid of merit and have no effect on Bottom's credibility. The discrepancy in her testimony as to the time of

her arrival at the tavern is completely insignificant and collateral to her testimony. She openly admitted this discrepancy and explained why she had been confused and how she had come to correct herself. Her apparent mistake that the defendant wore a flannel shirt on the night in question is equally harmless because there is no question that the defendant is the man with whom she spoke on January 11 and who gave her two tablets purportedly containing a controlled substance. The defendant also asserts that, because no one can remain in a tavern for very long without imbibing, the agent must have been lying when she testified that she did not drink until 9 p.m., 4½ hours after she had entered. This argument is utterly fatuous. We find absolutely nothing unusual with her assertion that she had drunk only nonalcoholic beverages until she met the defendant. The defendant next contends that her testimony concerning his purported purchase of yellow pharmaceutical speed was fabricated because no follow-up investigation was made. Such an inference is clearly unreasonable and not supported by the evidence. Likewise, no such inference can be made from the nine-month delay between the transaction and his arrest. Finally, the defendant argues that he offered testimony sufficient to cast doubt on the agent's testimony that she and the defendant had talked for 1½ hours. We strongly disagree. Three witnesses testified for the defendant as to the events that occurred that night: the first witness said the defendant was not even at the tavern that night, yet this is hardly convincing since she also was not present that night; the second witness refuted the first and said the defendant was present but that he did not speak at all to the agent; the final witness, the defendant, contradicted both of the preceding witnesses and testified that he was present and that he had spoken to the agent, but that they had only talked for 10 minutes. Such unsupported, self-interested testimony is plainly insufficient to raise a reasonable doubt concerning the defendant's guilt. The agent's testimony was positive and credible. She testified clearly as to the complete sequence of events. The jury heard the testimony, observed the witnesses' demeanor, and decided to believe the prosecution's evidence. Nothing has been presented which mandates us to disturb the jury's verdict.

■■ The defendant's second allegation of error is that the State failed to prove beyond a reasonable doubt that he had represented the substance delivered to agent Bottom as a controlled substance. He apparently argues that in order to convict an accused of violating section 404, the prosecution must prove that the accused delivered the substance and said, "Here is a controlled substance." This court recently rejected this argument in *People v. O'Connol* (1981), 98 Ill. App. 3d 625, 424 N.E.2d 930. There we said, "[A]n express denomination of the controlled substance by the defendant need not be established. The evidence is sufficient if the trier

of fact can reasonably find a common understanding between the defendant and the undercover officer that the substance being sold was a controlled substance." (*People v. O'Connol* (1981), 98 Ill. App. 3d 625, 629, 424 N.E.2d 930, 933.) This interpretation of section 404 was obviously necessary to prevent frustration of the legislature's intent by criminals' resort to circumlocution. As *O'Connol* and *People v. Sanderson* (1977), 48 Ill. App. 3d 472, 363 N.E.2d 180, demonstrate, this "common understanding" may be established by using the argot of the underworld drug seller. As was the case in *O'Connol* and *Sanderson*, the prosecution here offered undisputed evidence that the term speed represents amphetamines, a controlled substance, in the defendant's parlance. He then made his meaning absolutely clear when he vouched for the .controlled substance's potency, claiming only two "hits," a term which means tablet or dose, were required to "get off." Finally, the agent testified that "pharmaceutical speed" meant amphetamines which originated from a commercial manufacturer and which represented a purer form of controlled substance than that usually found. From this testimony, it cannot be denied that the prosecution sustained its burden of proving beyond a reasonable doubt that the defendant had represented the substances, which he delivered to the undercover agent, as controlled substances.

The determination of the foregoing issues was made and the defendant's conviction affirmed in an order issued pursuant to Supreme Court Rule 23 dated February 26, 1982.

The defendant thereafter petitioned for a rehearing which this court granted. In the rehearing petition the defendant argued that his conviction should be reversed on the basis of the supreme court opinion in *People v. Wagner* (1982), 89 Ill. 2d 308, 433 N.E.2d 267, which declared that section 404 of the Controlled Substances Act was unconstitutional (Ill. Rev. Stat. 1979, ch. 56½, par. 1404). As previously stated, it was this statutory provision that the defendant was found guilty of having violated. The issue now to be considered by virtue of having been raised in the petition for rehearing is whether *Wagner* dictates a reversal of the defendant's conviction. For reasons hereinafter set forth we find that it does not so dictate, and affirm the defendant's conviction.

■■ Before proceeding to the merits, we must first address the State's contention that the defendant has waived consideration of the issue of the constitutionality of section 404 by failing to raise it in any previous proceeding. Admittedly the defendant did not challenge the constitutionality of the section in the circuit court at any time or on appeal before the motion for rehearing. Nevertheless, we choose not to invoke the waiver rule in the present situation. The rule is one of administration designed to provide the circuit court with the opportunity to correct contemporaneously errors or defects made at trial. (*People v. Baynes* (1981), 88 Ill.

2d 225, 430 N.E.2d 1070.) In the present case no error existed for the circuit court to correct, because at the time of the trial and on the defendant's appeal, the *Wagner* decision had not yet been issued; thus, the statute was presumptively constitutional. (See also *People v. Wagner* (1982), 89 Ill. 2d 308, 433 N.E.2d 267.) Given these circumstances, we decline to dismiss the issue merely because the defendant failed to make what was then a futile gesture in the circuit court.

In *Wagner* the supreme court addressed the sentencing disparities between sections 401 and 404 of the Controlled Substances Act (Ill. Rev. Stat. 1977, ch. 56½, pars. 1401 and 1404), as they existed on August 3, 1978, the date on which the defendant violated section 404 by delivering a substance represented to be a controlled substance. At that time, a person convicted under section 401 for manufacturing or delivering controlled substances enumerated under schedule IV or V was guilty of only a Class 4 felony with the possible fine not to exceed $10,000 and $5,000 respectively. (Ill. Rev. Stat. 1977, ch. 56½, par. 1401(e), (f). The *Wagner* court conceded that fraudulent deliveries of noncontrolled substances are a proper subject for punishment because such punishment tended to discourage indirectly illicit transactions involving controlled substances (see *People v. Calcaterra* (1965), 33 Ill. 2d 541, 213 N.E.2d 270), but declared that the obvious yet unarticulated purpose of the Illinois Controlled Substances Act is to deter commerce in controlled substances by punishing more severely those traffickers and profiteers who deal in the noisome substances listed in schedules I through V (Ill. Rev. Stat. 1977, ch. 56½, par. 1201 to 1215). The anomalous result of this scheme was that the less serious conduct proscribed under section 404 carried a harsher penalty than the more harmful conduct outlawed in section 401(e) and (f). Relying on *People v. Bradley* (1980), 79 Ill. 2d 410, 403 N.E.2d 1029, the court found this scheme to violate the Illinois Constitution's due process clause (Ill. Const. 1970, art. I, sec. 2) because imposing harsher punishment on one who delivers a noncontrolled substance than on one who delivers a controlled substance was not reasonably related to the purposes and objectives of the Controlled Substances Act. In *Bradley* the court found section 402(b) of the Act to be unconstitutional because that section punished the possession of controlled substances more severely than delivering or manufacturing schedule IV or V controlled substances. This disparity was unreasonable given the legislature's expressed intention to punish persons who manufactured or delivered controlled substances more severely than persons guilty of possession. Ill. Rev. Stat. 1977, ch. 56½, par. 1100.

As the supreme court briefly noted in *Bradley* and *Wagner*, the Act's sentencing scheme has since been modified by Public Act 81-583. On January 11, 1980, when the defendant delivered a substance represented

to be a controlled substance, this amended scheme was in effect. Now section 401 (e) and (f) violations are classified as Class 3 felonies, but the potential fines remain $10,000 for the manufacture or delivery of schedule IV controlled substances and $5,000 for the manufacture or delivery of schedule V controlled substances. (Ill. Rev. Stat. 1979, ch. 56½, par. 1401 (e), (f).) Section 404 remains unchanged: a person convicted of delivering a substance represented to be a controlled substance is guilty of a Class 3 felony subject to a possible fine not to exceed $15,000. (Ill. Rev. Stat. 1979, ch. 56½, par. 1404.) The defendant asks this court to apply the holding of *Wagner* to this amended scheme, arguing that *Wagner* mandates that section 404 violations be less harsh than section 401(e) or (f) violations and that, even if this favorable disparity is not constitutionally mandated, the unconstitutional disparity condemned in *Wagner* remains because a section 404 violator faces a potentially greater fine.

We find that the amended sentencing classifications satisfy the requirements of due process set forth in *Wagner* and *Bradley*. This guaranty of due process of law is subject to the exercise of the police power in the interest of the public welfare, but it is subordinated only to the extent that the exercise of the police power bears a substantial relation to the promotion of public health, safety, morals, or general welfare. When the legislature exercises that power to create or define what constitutes a criminal offense and what punishment shall apply to that crime, its classification must not be purely arbitrary or capricious in relation to the harms sought to be curtailed. These above mentioned rules form two corollaries of constitutional law: first, the due process clause does not require meticulous exactitude in making legislative classifications for otherwise the judiciary would completely subjugate the legislature's role; and second, the judiciary must recognize that the legislature sits in a position superior to that of a court to make such classifications and must defer to the legislature's judgments accordingly, within, of course, the limits of the prohibition against arbitrary and capricious lawmaking. For this reason, legislative enactments are generally considered presumptively constitutional.

Here, after carefully reviewing *Wagner*, we conclude that it does not mandate a disparity of sentencing classification in favor of section 404 violators. First, although we agree with *Wagner* that the legislature need not have expressly recognized the differences between controlled and noncontrolled substances to find that the legislature intended not to punish offenses involving noncontrolled substances more severely than certain controlled substances, we think it unwise to equate all noncontrolled substances as harmless. As Chief Justice Ryan indicated in his dissent in *Wagner*, the proliferation of "look-alike" drugs—those noncontrolled substances having the same physical appearances as, if not the

same pharmacological effects of, dangerous controlled substances—poses a substantial danger and has received considerable attention in the General Assembly. Moreover, the legislature has not classified all section 401 offenses similarly to section 404 offenses. Only section 401(e) and (f) offenses, those involving the manufacture or delivery of relatively less dangerous schedule IV or V controlled substances are made Class 3 felonies. Finally, by increasing the punishment for section 401 (e) and (f) offenses to Class 3 felonies, while not disturbing the section 404 classification, the General Assembly in Public Act 81-583 has expressed its finding that the delivery of "look-alike" drugs is as harmful as the manufacture or delivery of schedule IV or V controlled substances. For these reasons, we cannot say that the amended sentencing scheme conflicts with the purposes and objectives of the Controlled Substances Act to such a degree as to constitute an arbitrary or capricious classification.

Moreover, the disparity between the potential fines for section 404 offenses and section 401 (e) or (f) offenses does not rise to constitutional dimensions. In dictum, the *Bradley* court noted with approval the amended scheme as it affected sections 402(b) and 401 (e) and (f). Yet, there, a section 402 offense, the lesser harm, carried the possibility of a heavier fine than the more serious offense proscribed in section 401 (e) or (f). (Ill. Rev. Stat. 1979, ch. 56½, pars. 1401(e), (f), 1402(b).) We cannot say that this disparity alone is sufficient to facially declare the amended section 404 unconstitutional. There may well be some situations where a fine imposed for the delivery of "look-alike" drugs may properly exceed that imposed for the delivery or manufacture of schedule IV or V controlled substances.

Accordingly, we affirm the judgment of conviction entered in the circuit court of Warren County.

Affirmed.

ALLOY and STOUDER, JJ., concur.