THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DERRICK BASS, Defendant-Appellant.

First District (2nd Division)   No. 79-919

Opinion filed May 13, 1980.

Patrick G. Reardon and Lawrence J. Suffredin, Jr., both of Chicago, and Mary Pat Burns, law student, for appellant.

Bernard Carey, State's Attorney, of Chicago (Iris E. Sholder, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

A jury convicted defendant Derrick Bass of murder and attempt armed robbery, for which he was sentenced to a term of from 25 to 50 years in the penitentiary. He appeals his convictions, raising as issues the questions of whether or not: (1) material evidence favorable to the defense had been suppressed notwithstanding defendant's pretrial discovery request for such evidence; (2) a mistrial should have been declared, or, in the alternative, a new trial granted by virtue of misconduct of the state's attorney during the opening statement, trial and final argument; (3) defendant was proved guilty beyond a reasonable doubt; and (4) defendant's arrest should have been quashed and certain evidence suppressed. For the reasons hereinafter set forth, we reverse and remand for a new trial.

The evidence revealed that George Bell, the homicide victim, owned and operated a neighborhood grocery store on South Ridgeway Avenue in Chicago for a number of years prior to the date of his demise, February 9, 1977. On that date Bell opened his store for business at about 7 a.m. Between 8 and 8:30 a.m. Jonathan Mayfield, a recently hired stockboy, arrived to begin his third day of work. A customer who had been present at that time left the store and Bell sat down behind the candy counter while Mayfield moved to the rear of the store behind the meat counter.

According to Mayfield, an intruder entered carrying a long dark gun and announced a stickup. The intruder fired two shots, fatally wounding Bell.

Evidence adduced at a hearing on defendant's pretrial motion to quash his arrest and suppress certain evidence reveals the circumstances of his alleged involvement. Three days after the shooting, on February 12, Iver Brown, married to Mayfield's sister, had a conversation with two Chicago Police officers, Cornelius Johnson and Arthur Jackson at Area 4 Homicide Police Headquarters at Harrison Street and Kedzie Avenue concerning Bell's death. Johnson testified at this hearing that Brown told him and Officer Jackson that he and Derrick Bass, known to Brown as "Dink," walked to Bell's grocery store together on the morning of the shooting, but that Bass entered alone. A few seconds later, Brown stated to Jackson, he heard a couple of shots and saw Bass run out of the store and away from the location. He looked through the door and saw Bell lying on the floor bleeding. At that time the butcher (later identified as Brown's brother-in-law, Mayfield) came out and said that Bell had been shot. Later that morning Brown received a call from Dink, who told him that he shot Bell when the latter reached for a gun.

Brown and the officers went to his mother's apartment where they were joined by homicide investigators Daniel Darcy and William Frost. In a rear bedroom, a cap, coat and .38-caliber revolver were recovered. Brown had defendant's phone number and apparently at police direction called him. Defendant agreed to meet Brown. The four policemen and Brown left the apartment, the latter entering his own vehicle followed by two police cars containing the police officers. Brown pulled up in front of a building on South Avers Avenue, from which defendant emerged and entered the car driven by Brown. They drove away and were later curbed by the police. Defendant was placed under arrest, read his constitutional rights and removed to homicide headquarters.

Defendant testified at the hearing on his motion that when Brown's car was stopped he asked police what was going on but received no answer. He was handcuffed and removed to the police station where he was fingerprinted and advised of his rights, but was never told why he was being arrested. Twenty minutes after his arrest he was placed in a lineup, at which time he was told the reason why he was there. After the lineup, he gave a statement to a police officer which was transcribed by a clerk and which he signed.

After reviewing the evidence, the trial court found that the police officers had probable cause to arrest defendant; they acted reasonably in proceeding without a warrant; and there was no basis upon which to quash the arrest or suppress the evidence. Defendant's motion was denied.

At the trial Mayfield testified as State's witness that he had known Bell

for most of his (Mayfield's) life, and had begun working for him as a stockboy two days before the shooting. On the fatal morning, while washing meat pans, he heard the door open and saw defendant enter. He knew defendant as "Dink" and had seen him before. Dink was wearing a blue parka and a black cap, and was holding a long, dark gun in his hand. Dink announced a stickup and, when Bell reached down to his side, Dink fired a shot. Mayfield dropped to the floor behind the meat counter where he remained until he heard the door of the store open and close again. Rising from the floor, he called out to Bell lying on the floor and when he received no response ran out of the store and shouted, "call the police." Circumstances surrounding Mayfield's activities for the rest of the day were brought out at a post-trial hearing which will be described later in the opinion. On cross-examination, Mayfield stated that he did not tell police who had shot Bell when they first arrived. On redirect examination Mayfield testified that he gave the name Dink to the police immediately after he had taken a lie detector test; the defense maintains this was the first time it knew of such an examination. Mayfield testified that he had delayed several hours before informing the police of the name of the killer because they asked for his name, rather than his nickname.

Investigator Darcy testified that he and his partner, William Frost, investigated Bell's homicide. At the grocery store they observed the lifeless victim and had a conversation with Mayfield who accompanied them to Area 4 Headquarters and was with them until 6 or 7 p.m. that day. They spoke to Mayfield again on February 12 at Area 4 Headquarters and then proceeded to the second floor apartment of Iver Brown. His description of events taking place thereafter coincided with Officer Johnson's testimony given at the hearing on defendant's motion to quash.

Concerning other post-occurrence activities, Mayfield also testified at the trial that after he had viewed the lineup he went with police officers first to his own house and then to Iver Brown's house where police officers recovered a blue parka and a hat identified by Mayfield in court as the clothing he had seen defendant wear at the time of the murder. After viewing the long-barreled gun recovered in Brown's apartment, Mayfield stated that he had not seen it prior to February 9 and that it was not Iver Brown's gun.

For the defense, Dyrell Bass, defendant's 16-year-old brother testified that on the morning of February 9, 1977, he and defendant left home a little after 9 a.m., although he had not looked at a clock. He was late and had to be awakened by his father for attendance at the "Y" high school. After leaving the house he and his brother met a couple of friends who lived across the street and stopped at "Downey's" store on Cermak Road which defendant entered alone as Dyrell waited outside. Shortly thereafter they parted company. On cross-examination Dyrell could not

remember at what time he woke on February 9, 1977, or the time he left the house that day, the day of the week on which that date fell, the fact that Bell was murdered on that day, or what his brother had been then wearing.

Robert Bass, defendant's father, testified that he overslept and missed a 9 a.m. appointment on February 9, 1977. He had awakened his sons shortly after 8:30 a.m. and saw defendant again at 8:40 a.m., telling him to get ready for school. When Robert left the house at about 8:50 a.m. defendant was still there.

Jim Downing, who owned the grocery store on Cermak Road, testified that he had known defendant and his brother Dyrell prior to February 9, 1977. On that date he saw defendant between 9:05 and 9:10 a.m., when the latter had come to buy cigarettes, although the store was not then open. He spoke to defendant through the bars of the door, through which he passed the cigarettes. He knew the Bass family for 12 to 15 years and had known defendant since he was little.

Karl Hobbs was called as a witness for the defense. He had been twice convicted of burglary and sentenced to probation the first time and 1 to 2 years the second. He was also known as Larry White and Carl Sherrard. He knew Iver Brown, Jonathan Mayfield and defendant, by the names, respectively, of "Dennis," "Nooney" and "Dink." He had been to Dennis' (Brown's) apartment 20 times before over a three-month period and had seen him with a long black gun every time he was in the apartment. People's Exhibit 9, the gun removed from Brown's apartment, belonged to Dennis according to Hobbs. He never saw Dink with the gun. Nooney [Mayfield] worked in Bell's store and was frequently seen by Hobbs at Dennis' apartment. He spent the entire day of February 8 with Dennis and Nooney in Dennis' apartment. Dennis and Nooney discussed robbing Bell's store and Nooney said the best time would be in the morning. Dennis was to be the "triggerman" and everyone was to spend the night at his house. Defendant was not present at the time of this conversation. Hobbs was asked by Dennis to participate in the robbery but he declined. He did not report the plan of robbery to the police and regarded himself as a friend of defendant's.

After hearing the evidence the jury found defendant guilty of murder and attempt armed robbery, for which he was sentenced as previously noted.

Defendant filed a post-trial motion for a new trial alleging, among other reasons, that the polygraph test taken by Mayfield had been improperly suppressed. The State averred that it had no knowledge of the test prior to Mayfield's testimony on redirect examination and also observed that defendant made no request at that time for a continuance or recess during which to seek any further information. A subpoena duces

tecum was issued prior to the post-trial motion hearing addressed to the police superintendent of Chicago requesting the production of "notes taken, record of questions put to and answers made by Jonathan Mayfield before, during and after, and the result of and report about, a polygraph examination of the said Jonathan Mayfield in connection with the investigations of attempt robbery and homicide of George Bell." Over the State's objections, the defense for the first time was furnished with reports written by John Stout, a civilian polygraph operator employed by the Chicago Police Crime Laboratory. Each report bore the same Chicago Police "RD" (Records Division) number that was assigned to the supplemental police report of February 9, 1977, the date of the murder, R.D. Y 042 565.

Stout testified at the hearing on the post-trial motion that Mayfield was brought to him for a polygraph examination at 11th and State Police Headquarters on February 9, 1977, by Investigators Darcy and Frost, who were not present when it was given. Mayfield told him in conversation (after he took the examination) that he had seen the man who murdered Bell before around Ogden and Ridgeway a number of times with a man named Karl, and he would be able to identify a picture of him. During the test questioning, he denied knowing the name of the man who shot Bell and denied withholding any information from the police about the shooting. Mayfield made no reference at that time to the names of Derrick Bass or Dink; his first accusation of defendant came immediately after the examination was concluded and Stout had told him that Mayfield himself could not be cleared as a suspect for Bell's murder. He told Mayfield he did not think he was being completely truthful and that he was withholding information as to the name of the offender. On cross-examination Stout revealed he had made notations of his conversation with Mayfield, used by him to refresh his recollection for the purpose of testifying, which constituted the records he kept concerning Mayfield's polygraph examination. These consisted of Stout's handwritten notes of the answers only, prepared for his own use during the examination, which did not cover the entire conversation and included single words, partial sentences, abbreviations and symbols. The records were kept in his custody in the polygraph unit of the crime laboratory.

The trial judge specifically found that there was no significant variation between Mayfield's trial testimony and his responses to John Stout and that Mayfield had been a credible witness. The court also found that there was no evidence of any wilful suppression of evidence or violation of the discovery rules by the State or prejudice to the defendant.

## I.

Focusing upon the circumstances surrounding the polygraph

examination of the only alleged eyewitness to the murder, defendant identifies error in the refusal of the trial court to grant him a new trial when it was learned that this material evidence, which was favorable to him, had been suppressed despite pretrial discovery requests. Defendant observes that not only was he not furnished with the polygraph examiner's report or even his name until the date of the post-trial motion, but that if witness Mayfield had not alluded to the test on redirect examination by the State, the procedure would have been entirely unknown to the defense. Relying upon *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, *People v. Burns* (1979), 75 Ill. 2d 282, 388 N.E.2d 394, and *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40, defendant claims the violation of his right to due process in the suppression of this evidence.

The defense points to Supreme Court Rule 412(a), (c), (f) (Ill. Rev. Stat. 1977, ch. 110A, pars. 412(a), (c), (f)) as authority for its insistence that the submission by Mayfield to a polygraph examination was clearly within the contemplation of the discovery rules, particularly the language appearing in 412(a)(i) which requires disclosure of "* * * memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements." Section 114—13 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—13) requires that discovery procedures in criminal cases shall be in accordance with Supreme Court Rules. On April 12, 1977, the defense filed a motion seeking discovery from the State specifically requesting some of the items referred to in Rule 412, among which were:

"2. A List of Witnesses of persons [*sic*] the prosecution may or may not call as witnesses and their addresses, including production of the following:

a) Any written or recorded statements by these witnesses, including those written or recorded statements of police officers;

b) Any memoranda reporting or summarizing oral statements by such witnesses.

* * *

17. * * * any reports and results of any and all scientific tests, experiments and examinations made by experts or others and the names of such persons who conducted the tests, (including such tests as: narcotic identification, pathological reports, ballistics, fingerprints, blood, semen and other stains) pertinent to this case.

* * *

20. * * * the names and addresses of any witness or witnesses that may be or would be favorable to the defense. These witnesses to be clearly and separately identified on the List of Witnesses. The

same disclosure is requested of any physical evidence or scientific evidence that might be or would be favorable to the defense."

■■ The foregoing request was sufficient to require production of Mayfield's polygraph interview records, in our opinion. Several subsequent defense efforts were also made before trial to secure from the State any statements made by its prospective witnesses. As Mayfield was the only person purporting to have witnessed the crime and to have supplied a description of the assailant, his clothing and the murder weapon, his testimony was pivotal in the case; when he took the witness stand, his credibility was placed before the jury and any efforts to reduce the efficacy of his testimony were therefore relevant and material, if not crucial. Much of the State's brief is devoted to the exposition of cases which postulate the rule that the results of a polygraph examination with respect to proof of guilt or innocence of an accused (which Mayfield was not) are inadmissible as evidence. (See, *e.g., People v. Nicholls* (1970), 44 Ill. 2d 533, 539, 256 N.E.2d 818.) Defendant was not limited to utilizing the *results* of the polygraph examination; he was seeking the reports, he claims, in order to ascertain whether any *statements* made by this witness contained information or would lead to information bearing upon defense strategy and trial preparation, a use permissible under the authorities. See *People v. Hutchison* (1977), 55 Ill. App. 3d 716, 371 N.E.2d 201 (State did not violate Rule 412 where it failed to supply written report of witness' *statements* of polygraph examination since defense attorneys were already apprised of their contents prior to trial and which was not favorable to defendant in any event); see also *People v. Nelson* (1965), 33 Ill. 2d 48, 51, 210 N.E.2d 212, *cert. denied* (1966), 383 U.S. 918, 15 L. Ed. 2d 671, 86 S. Ct. 911 (defendant was properly afforded access to "* * * *statements* made [by witness] during the polygraph tests" (emphasis supplied)).

From the reports it appears that Mayfield denied, among other things, knowing the name of the man who shot the victim and denied withholding any information from the police about the shooting. According to Stout, whose identity surfaced when the defense sought out the report, it was only after Mayfield was advised that he himself could not be cleared as a suspect for Bell's murder that he named Dink as the perpetrator. Mayfield's statements and Stout's testimony must be considered favorable or beneficial under the circumstances thus presented. In *People v. Dixon* (1974), 19 Ill. App. 3d 683, 312 N.E.2d 390, the crucial evidence consisted, as in the case at bar, of testimony by the only prosecution witness claiming to have seen the crime committed. Because the statement of another witness regarding the incident was withheld from production by the State, and it varied in some details from the version given by the witness who testified, the court regarded the

withheld statement as "* * * favorable to the defendant in that it reflected adversely upon the credibility of the State's sole witness" and required to be produced under the *Brady* rule. (19 Ill. App. 3d 683, 686.) Similarly in the case *sub judice*, the defense had the right to be informed of the Mayfield tests and statements, and thereby be in a position to advise itself further of the circumstances attendant to defendant's identification. As the *Dixon* court noted (19 Ill. App. 3d 683, 688):

> "It is not this court's purpose to speculate as to what use the defense could or would have put the evidence in question, or what additional evidence it may or may not have led to, had it been turned over prior to trial. The fact remains that this evidence was not available, as it should have been, to defendant when his defense at trial was being planned and prepared. The belated turnover of these reports after trial was sufficient to deprive defendant of their effective use and in no way cured the harm done by failing to turn them over to defendant initially. [Citations.]"

Accord, *People v. Keith* (1978), 66 Ill. App. 3d 93, 96-97, 383 N.E.2d 655; *People v. Parton* (1976), 40 Ill. App. 3d 753, 758, 354 N.E.2d 12.

The State contends that because the requested discovery did not mention polygraph information specifically, presumably by name, the standard to be applied is not whether the information might have affected the outcome of the trial but whether it would have created a reasonable doubt of guilt, citing *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392, and *People v. Jones* (1977), 66 Ill. 2d 152, 361 N.E.2d 1104. *Agurs* is distinguishable from the present case, however, since there no appropriate request for production was made prior to trial. In *Jones*, the testimony deemed by that defendant to have been favorable was essentially corroborative of the testimony given by the State's witness and in several particulars contradicted his own. Because Mayfield was the sole eyewitness in the case before us, " '* * * additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.' " *Jones*, 66 Ill. 2d 152, 160, quoting from *Agurs*, 427 U.S. 97, 112.

As additional support for its position, the State cites *People v. Durso* (1968), 40 Ill. 2d 242, 250, 239 N.E.2d 842, *People v. Witherspoon* (1979), 69 Ill. App. 3d 391, 397, 388 N.E.2d 1, and *People v. Holmes* (1976), 41 Ill. App. 3d 956, 967, 354 N.E.2d 611, *rev'd on other grounds* (1978), 69 Ill. 2d 507, 372 N.E.2d 656, for the principle that only statements couched in the witness' own words or in substantially verbatim form are producible, and suggests that rough notes such as those maintained by Stout do not meet this test. Rule 412(a)(i), however, requires production also of "* * * a list of memoranda reporting or summarizing their [witnesses'] oral statements. * * *" (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)(i)), and

similar request language appeared in defendant's discovery motion. The State was obligated to present such a list to the court if it had any doubt as to the discoverability of the memoranda and to make such objections to their disclosure as it believed necessary. Here, the fact that a test was given at all was suppressed together with the attendant circumstances. Further, Stout apparently had no difficulty in summarizing from his memoranda the oral statements made by Mayfield, even though called upon to do so more than one year after he recorded them. An examination of the notes themselves by the court would have more accurately revealed the extent to which they could have been deemed "substantially verbatim" within the meaning of Rule 412(a)(i), particularly in view of Stout's recognition that State law required him to write out the questions put to and responses made by the examinee, apparently referring to Regulations IV.2. and VII.1. of the Rules and Regulations Promulgated for the Administration of the Illinois Detection of Deception Examiner Act, amended on June 19, 1975, by the Department of Registration and Education.

The State seeks to excuse its noncompliance with the rule by pointing to defense counsel's failure to follow up Mayfield's testimony that he had taken the examination by seeking compliance under Rule 415(g) and other relief suggested by *People v. Foster* (1979), 76 Ill. 2d 365, 384, 392 N.E.2d 6. The facts in *Foster* are dissimilar to those obtaining here, however. Defense counsel in *Foster* knew of the existence of the statement withheld and, apparently, its contents before the witness took the stand; he therefore could have made a determination of its effect in advance of the testimony. In the present case the defense was apprised of the test only upon redirect examination of the witness, when he mentioned having taken it. None of the attendant circumstances were then known to the defense nor any possibly inconsistent statements made during the course of the interview. Supreme Court Rule 415(g) would have been of little use in these circumstances: based upon the post-trial proceedings raising as a ground for a new trial the suppression of any statements made by Mayfield at the time of the test and the State's subsequent resistance to their disclosure even then, it appears that any effort by the defense to continue the trial until such time as the reports were produced, Stout was presented before the court for testimony and the extensive legal arguments were prepared and submitted by both sides which proved necessary before the defense was placed in the position of knowledge in this case, would have occasioned an inordinate delay in the trial proceedings.

The State insists that the withheld statements were neither material nor favorable because Mayfield's answers to Stout's questions during and after the polygraph procedure were consistent with his trial testimony. This is so, it asserts, because the only conflict that could be said to have

emerged is that Mayfield truthfully denied knowing the name of the assailant when questioned by the State, as he testified at trial, since Stout asked only for defendant's name, not his nickname. This attempted expurgation is both tenuous and incomplete in light of the fact that Mayfield also denied withholding *any* information from police about this shooting. Further, Mayfield's transposition from lack of knowledge, before he was told he could not be cleared as a suspect himself, to knowledge of the assailant's identity thereafter might also have borne potential significance to the defense. Defendant had the right to know of these statements and circumstances when he requested the information for whatever permissible use he may have wished to put it to, whether to show bias, prejudice or for purposes of impeachment, or to seek out other and further information therefrom. It is clear that Mayfield's credibility was a material issue; any diminutional information relating thereto was likewise material. (*People v. Sumner* (1969), 43 Ill. 2d 228, 252 N.E.2d 534; *People v. Cagle* (1969), 41 Ill. 2d 528, 244 N.E.2d 200.) The defense, not the State, was in a unique position to determine the most effective use to be made of the statements and had the right to make its own evaluation thereof. "Justice requires no less." *Jencks v. United States* (1957), 353 U.S. 657, 668-69, 1 L. Ed. 2d 1103, 77 S. Ct. 1007.

Final argument presented to the jury in this case demonstrates the importance to the defense of the polygraph examination. The question of Mayfield's truthfulness was one of the cynosures of argument by the prosecution and the defense argued that Mayfield was a liar because he did not give police the name of the offender until after taking a lie test. At that time, however, the defense was unaware that during the test Mayfield denied knowing the name of the offender or withholding information. Nor did it know that it was only after Mayfield was told he could not be cleared of suspicion himself that he named Dink as the assailant. The State, on rebuttal, was thus able to argue without contradiction: "It is the defense theory of the case, that Jonathan Mayfield was lying, but there is certainly no admission in the case to that effect. And there is no evidence in this case to that effect. Now, the police did give Jonathan Mayfield a lie detector test. Jonathan Mayfield is not an admitted liar. He's not a liar at all." The jury could well have inferred from the foregoing that the test results were favorable to Mayfield and that his veracity had been confirmed by them.

■■ For the foregoing reasons the suppression by the State, whether wilful or inadvertent, of the fact that a polygraph examination was given its key witness, and the reports of that test, was inconsonant with Supreme Court Rule 412 and denied to defendant his due process entitlement. (*Brady v. Maryland; People v. Burns; People v. Nichols.*) The

trial court should have granted defendant a new trial; its failure to do so was error.

## II.

■■ The second issue raised by defendant is that the trial court erred in failing to declare a mistrial or, alternatively, in failing to grant a new trial because of repeated prosecutorial misconduct during the State's opening statement, the trial and final argument. Because the case must be retried we will consider certain of the contentions made. During the opening statement, the prosecutor told the jury that the evidence would show Iver Brown to have been an accomplice of the accused and that he assisted in Bell's murder. No direct evidence was presented in this matter; however, circumstantial evidence was presented linking Brown himself to the murder. The State correctly contends that these statements were inferences which could fairly have been drawn from the circumstantial evidence and which it had a right to bring to the jury's attention. *People v. Riles* (1973), 10 Ill. App. 3d 772, 777, 295 N.E.2d 234.

● 4 After a long series of sustained objections by defense counsel relating to testimony the State sought to elicit from Officer Darcy concerning the conduct of the lineup, one of the prosecutors, in the presence of the jury, stated "Your Honor, apparently [defense counsel] doesn't want the jury to hear about the lineup. Can we continue with our questioning, please?" Defendant regards this as tantamount to informing the jury that defense counsel was withholding evidence from them. The State claims that defense counsel's course of conduct prior to the remark provoked it, relying upon *People v. Schwing* (1971), 133 Ill. App. 2d 100, 272 N.E.2d 779. We regard such statements as better left unsaid, and trust that there will be no repetition upon retrial of the case. Defendant also maintains that the prosecution knowingly presented false evidence: by avoiding any questions to Mayfield concerning the time he was with police and withholding information about Dink; by allowing Mayfield to "lie" in his testimony in asserting that he failed to reveal who shot Bell earlier because he wasn't asked; and by portraying Mayfield as a helpful, disinterested citizen rather than as a suspect who had an interest in the outcome of defendant's trial and a motive for testifying falsely. The State maintains that Mayfield's testimony was not false, relying again upon the name/nickname distinction in accounting for his failure to supply the name Dink. Assuming the improbability of Mayfield's attempt to distinguish between the name and nickname, we do not believe that the condemned use of perjury by the State was established here as required by *People v. Bracey* (1972), 51 Ill. 2d 514, 520, 283 N.E.2d 685.

■■ Defendant points to the prosecutor's repeated statement in rebuttal

that the State "vouched for [the] credibility" of its witnesses, particularly Jonathan Mayfield, thus improperly injecting her personal beliefs into the argument; the prejudicial effect is seen as compounded by the fact that the jury knew a lie detector test had been given to Mayfield but did not know its results, thereby implying that the authorities, knowing the results, could attest to his veracity. The State responds that the prosecutor was properly commenting upon the credibility of the State's witnesses and that any personal element in her comments was invited by defense counsel's repeated attacks upon Mayfield as a "liar." We note that an objection was made by the defense and sustained as to the prosecutor's vouching for Mayfield's credibility; however, vouching for witnesses or evidence is impermissible and should be omitted irrespective of whether or not an objection has been made and sustained. (*People v. Martin* (1975), 29 Ill. App. 3d 825, 331 N.E.2d 311; *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256.) Other instances of alleged prosecutorial misconduct are without foundation and need not be discussed here.

### III.

In light of the facts set forth earlier in this opinion, defendant's next contention that the evidence at trial was insufficient to support his conviction is without merit, pretermitting the suppression of the lie detector examination statements hereinbefore discussed.

### IV.

With regard to the final assertion made by defendant on appeal, that the trial court erred in denying his pretrial motion to quash his arrest and suppress evidence, we find that under the relevant standard articulated in *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329, the police officers in the instant case had the power to arrest defendant without a warrant because they had reasonable grounds for believing at the time of the arrest that defendant had committed a felony. (See also Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) Defendant argues that the only specific information underlying his arrest was Officer Johnson's hearsay testimony of a conversation with Iver Brown, whose information was not credible because of his involvement in the crime and because he initially failed to tell police that it was Dink who ran out of the store and passed him after the shooting, Brown having withheld this information until three days after the murder. The State observes that there was substantial evidence corroborating Brown's statement, which included a description, physical facts and information received from other sources. In *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537, the court found probable cause for the arrest of the defendant there based upon information provided by one of the participants in the crime, who nevertheless denied

his involvement. As in the case at bar, police had evidence implicating the informant who professed to know who had taken part in the crime and the location of the weapon. These circumstances were found to lend sufficient credence to his information as to make that defendant's arrest reasonable. We find no error in the trial court's ruling with respect to defendant's motion.

For the reasons we have set forth above, we reverse and remand the cause for a new trial.

Reversed and remanded.

STAMOS and DOWNING, JJ., concur.