THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MELANIE K. SKILES, Defendant-Appellant.

Third District   No. 81—610

Opinion filed May 12, 1983.—Modified on denial of rehearing July 11, 1983.

817

SCOTT, J., dissenting.

Robert Agostinelli and Peter A. Carusona, both of State Appellate Defender's Office, of Ottawa, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Norman K. Rafferty, State's Attorney, of Hennepin (James E. Fitzgerald, Darrell Panethiere, and Michael B. Weinstein, Assistant Attorneys General, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, Melanie Kay Skiles, was originally charged by information with obstruction of justice. Before trial, an information was filed charging the defendant with murder by accountability under sections 5—1, 5—2, and 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, pars. 5—1, 5—2, 9—1). On the first day of trial, the State was allowed to drop the obstruction charge and join, by information, a charge of conspiracy to commit murder, under section 8—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 8—2(a)). A jury convicted the defendant of conspiracy to commit murder and, on an accountability theory, voluntary manslaughter. She was sentenced to concurrent terms of four years' imprisonment on each guilty verdict. The defendant appeals and asks this court to reverse and remand those convictions, or, in the alternative, order a resentencing.

This case arises from the killing of Henry Nellums. Mr. Nellums, age 64, was shot in the head while sleeping. His stepdaughter, Darlene Nellums, age 14, held the gun and pulled the trigger. The bizarre facts surrounding this case developed in the following manner. On January 3, 1981, at approximately 6:30 a.m., the defendant, Melanie Skiles, age 18, called the police to the house trailer of Henry Nellums in Hennepin because there had been a shooting. Henry Nellums was found in the master bedroom lying on his back across his bed. He had been shot in the head; there was no pulse and the body was cold. The only other occupants in the trailer, when the police arrived, were the wife of the victim, Judy Nellums, and the adoptive daughter of Mr. Nellums, the natural daughter of Judy Nellums, Darlene Nellums. The defendant was Darlene's friend and had stayed the night as a guest.

During the course of the investigation, the defendant made several statements to the police. On the afternoon of January 3, she told the police that Judy Nellums had discovered the body and that because the room was in a shambles, they presumed an intruder had shot him, although no one heard any shots during the night. Later the same day, the defendant recanted and explained that the defendant and Darlene had returned to the trailer at approximately 2 a.m. on January 3, heard Judy and the victim arguing, heard a shot, and then

learned that Judy had accidentally shot Mr. Nellums in a scuffle. The above statements were not offered in evidence.

On January 5, the police recorded two more statements by the defendant. The second statement corroborated the first, and went into more detail. A transcript of these two statements was presented to the jury, and the recordings were also played in their presence. The substance of these statements, which defendant claimed to be "the honest to God's truth," is as follows: On January 2, 1981, Darlene confided in the defendant that she and her mother hated her father, and that Darlene wanted to kill him. The record suggests that Henry Nellums had on several occasions abused both Darlene and Judy Nellums. Darlene told the defendant about her previous plans to kill Mr. Nellums. She had thought about shooting him while they were hunting or blowing him up in his truck. Darlene then began talking outright about killing her father. The defendant stated she helped Darlene come up with ideas for killing Mr. Nellums because she wanted to help her friend. They apparently came up with a plan, listed steps of things to do (the list was entered as an exhibit at trial), and began to follow the plan.

At about 10 p.m., after Mr. Nellums was heard snoring, Darlene got her gun, cleaned it, and then took steps to stage a robbery by taking the victim's wallet. Next, Darlene hid the money, gathered into a bag the wallet and some tape recordings which contained previous plans to kill her father, and at midnight Darlene and the defendant left the house trailer through Darlene's bedroom window. They walked to a nearby river. While the defendant waited on a landing, Darlene threw the bag and contents into the river. According to the defendant's latter statement, after the bag was thrown into the river, defendant thought they had to go through with the plan or else Darlene would be in a lot of trouble.

Darlene and the defendant next walked over to a male friend's house. Before calling on the friend, Darlene hid the gun and knife, which she had been carrying, in the friend's mailbox. The friend testified that they told him about the plan and showed him the weapons. The friend, intoxicated, did not believe them. After the friend returned inside, they returned to the victim's trailer. Before entering the trailer, Darlene slit Mr. Nellums' screen to create the appearance of a robbery. Shortly afterward, Darlene asked the defendant to shoot Mr. Nellums. The defendant absolutely refused and told Darlene she would have to do it herself. Darlene then went into her mother's room and apparently obtained her mother's permission to shoot the victim. Darlene returned to her father's room with the defendant. In

the former recorded statement, the defendant claimed that she did not know if Darlene was serious or just "trying to pull [her] leg." Nevertheless, once in Mr. Nellums' room, Darlene motioned to the defendant to come closer to Darlene, and asked the defendant to keep talking (apparently to give Darlene support). The defendant stood one or two feet behind Darlene with her hand on Darlene's back. The defendant told Darlene to remember the freedom she was going to have and wanted, and that if Darlene backed out her father might kill her—that it was her life or his. The defendant told Darlene she was going to have money and freedom. The last word defendant spoke before the shooting was "freedom." Darlene then shot her father and later hid the gun in the humidifier.

Judy Nellums was not prosecuted. Darlene Nellums was prosecuted as a juvenile, under section 2—7 of the Juvenile Court Act (Ill. Rev. Stat. 1981, ch. 37, par. 702—7). Pursuant to a fully negotiated plea of guilty to the concealment of a homicide, Darlene was made a ward of the court and was placed on probation. Darlene, during the course of her proceedings, was entrusted to the care of the Department of Children and Family Services (D.C.F.S.) and was treated by the Illinois State Psychiatric Institute (I.S.P.I.).

On appeal, the defendant presents 11 issues for review. We shall begin by considering, together, several issues which concern Darlene and the victim. These issues allege the lower court erred as follows: (1) Defense counsel should have been given the address of Darlene so that counsel could have spoken with her. The record, however, does not indicate that defense counsel wished to call Darlene as a witness; (2) Defense counsel should have been able to obtain the mental health record of Darlene compiled by the I.S.P.I. The trial court, besides questioning the relevancy of this information, agreed with the concerned State agencies that the information was confidential and protected by section 1 *et seq.* of the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1979, ch. 91½, par. 801 *et seq.*); (3) Defense counsel should have been allowed to introduce evidence tending to show the victim's state of mind and Darlene's prior attempts to kill her stepfather. The record indicates that defense counsel was unable to lay the proper foundation required to introduce this evidence; (4) The court should not have granted the State's motion *in limine* which restricted defense counsel's ability to impeach Darlene, if she would have testified. However, Darlene was not called as a witness.

We would like to note briefly that the assistant State's Attorneys, in their brief, tell this court the disputed mental health report was

turned over to the defense, that it is part of the record on appeal, and that we can see for ourselves the irrelevancy of the report. This statement is inaccurate. The report was not given to defense counsel and is not part of the record. Nevertheless, it is not necessary that this court review the report in order to sustain the trial court's rulings.

The above allegations of error are not well taken. Such evidentiary matters, the proof of which was the ultimate objective of defense counsel's maneuvering, was duplicative of other evidence available to the jury and immaterial to the charges brought against the defendant. Several times during the trial defense counsel explained to the lower court what would have been proved had the court ruled favorably upon his requests. Counsel claimed he could have shown that Darlene had a long-standing hatred of her stepfather, that Darlene had on previous occasions planned and attempted to kill her stepfather and that Darlene would have killed her stepfather on the night in question whether the defendant had been there or not. Counsel's reasoning was that if Darlene would have killed her stepfather on her own momentum, the defendant could not have contributed to the murder and thus could not be held liable for conspiracy or accountability.

■ First, we must note that the evidence presented by the State consisted, in large part, of two recorded, properly obtained, confessions of the defendant in which the defendant described, step by step, the events leading up to, including and after the shooting. The jury was given a transcript and the recordings were played in their presence. The defendant, in her confessions, recounted discussions in which Darlene described her long-standing hatred of her stepfather and the prior plans and attempts to kill him. In light of defense counsel's theory, it seems no new facts would have been established by introducing the omitted evidence. Furthermore, the record does not show that defense counsel made an offer of proof that the disputed evidence would have contradicted the defendant's confession. The introduction of the omitted evidence would have in no way changed the facts upon which the jury made its decision. Thus, its exclusion could not have been prejudicial to the defendant. *People v. Marmon* (1945), 389 Ill. 478; *People v. Hairston* (1980), 86 Ill. App. 3d 295; *People v. Hankins* (1967), 90 Ill. App. 2d 51, 58.

■ Second, the defendant was charged with conspiracy and accountability. Conspiracy requires a showing of an intent and an agreement on the part of the defendant to commit an offense, and an act in furtherance thereof (Ill. Rev. Stat. 1981, ch. 38, par. 8—2(a)). Accountability can be founded upon the same proofs. The difference between the two crimes is that accountability requires the commission

of an offense, whereas conspiracy does not require the commission of any offense. (Ill. Rev. Stat. 1981, ch. 38, pars. 5—1, 5—2; *People v. Burleson* (1977), 50 Ill. App. 3d 629, 636; *People v. Gregory* (1979), 73 Ill. App. 3d 127, 134.) The elements of these crimes do not require a showing of prior acts, motivations, state of mind and/or intent of the victim and/or accomplice in order to prove the crimes. It does not matter whether the accomplice would have performed the intended offense had the defendant never been born. What matters is the intent, agreement, and actions of the defendant. (*People v. Ambrose* (1975), 28 Ill. App. 3d 627.) There was ample evidence presented at trial, most importantly the defendant's own undisputed confessions, for the jury to find that the defendant, with intent to commit an offense, aided and agreed with Darlene to commit an offense and an act in furtherance thereof occurred (thus establishing the conspiracy), and a killing took place (for which the defendant is accountable). Considering this conclusive proof of guilt arising from the confessions, this court cannot reverse the jury's verdict because of the omission of the disputed evidence. *People v. Hankins* (1967), 90 Ill. App. 2d 51, 58.

We hold that the evidence which defense counsel sought to obtain and/or introduce at trial was immaterial to the charges brought against the defendant. Since this evidence was immaterial, there could not have been prejudice to the defendant by their exclusion.

■ We next turn to two of the defendant's contentions which will require a more precise analysis. The defendant argues that, contrary to the trial court's finding, conspiracy to commit murder is not an included offense of murder (by accountability) and, therefore, the court should not have allowed the State to add a conspiracy charge to its case on the first day of trial. The propriety of allowing the State to add a charge on the day of the trial does not turn on whether the added charge is, as a matter of law, a lesser included offense of the original charge. The issue is whether the defendant suffered a denial of due process in that the defendant was not given adequate time to prepare her defense. What is a reasonable time for preparation of a case must necessarily depend upon the facts and circumstances and is largely a matter resting in the sound judicial discretion of the trial court, which will be disturbed on review only when it is shown that the discretion has been abused. (*People v. Storer* (1928), 329 Ill. 536, 539-40; *People v. Gore* (1972), 6 Ill. App. 3d 51, 55.) There is not a reversible abuse of discretion where the defendant has not been prejudiced by the refusal of the trial court to grant a continuance. The question to be answered is: Did the defendant have sufficient time to familiarize herself with the evidence and prepare a defense? (See *Peo-*

*ple v. Gore* (1972), 6 Ill. App. 3d 51, 56.) If the addition of the conspiracy charge required the State to present a new theory of the case and new evidence, then, the defendant should have been allowed time to familiarize herself with the new theory and evidence. However, after reviewing the criminal informations and evidence, we believe the addition of the conspiracy charge did not change the theory of the case or require the introduction of new evidence.

■ The defendant was originally charged with the offense of murder by accountability in that with the intent to promote or facilitate the commission of the murder, she solicited, aided, and abetted Darlene in the planning or commission of the offense of murder. This is a very broad charge. The defendant was on notice that the State would try to prove intent and that a murder took place. The defendant was also on notice that the State could prove its case with any evidence which proved the defendant solicited, aided, abetted Darlene in the planning or commission of the offense. Such evidence could have been the verbal support the defendant gave Darlene, the discussions on how to commit the murder, the planning of the murder (these last two facts clearly show an "agreement" to commit the offense which is an element of the conspiracy charge), the assistance in getting the weapon and disposing of the bag, the physical assistance of standing by Darlene at the time of the murder. All and any of these facts were going to be at issue at the trial even before the conspiracy charge was added. The conspiracy information charged that the defendant, with the intent to commit murder, agreed with Darlene to the commission of the offense and performed an act in furtherance of that agreement. All the evidence needed to prove the conspiracy charge was already available to the defendant as part of the accountability charge. There was no new theory of the case. The story was the same. Furthermore, no new factual issues were raised. The defendant should have been familiar with the evidence and prepared to counter the proofs of the State for both charges. There was no reason to allow the defense extra time to review the case. Therefore, the trial court did not abuse its discretion and the defendant was not denied her due process right. The decision of the trial court to add the conspiracy charge is affirmed.

■ Also, defendant submits multiple convictions and concurrent sentences are inappropriate in this case. The supreme court, in *People v. King* (1977), 66 Ill. 2d 551, 566, reviewed the issues which arise when a defendant is subject to multiple convictions and concurrent sentences and held that "[p]rejudice results to the defendant only in those instances where more than one offense is carved from the same

physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses *** 'Act' *** is intended to mean any overt or outward manifestation which will support a different offense." If we find there was but one act, then multiple convictions are inappropriate. If we determine there were several acts, then multiple offenses may be appropriate, unless one of the offenses is an included offense of the other. A lesser included offense is one comprised of some, but not every element, of the greater offense. The greater offense will include very element of the lesser offense plus some other elements so that it becomes impossible to perform the greater offense without committing the lesser one. Ill. Rev. Stat. 1981, ch. 38, par. 2—9.

The facts of this case permit us to find there were multiple "acts" in the sequence of events which resulted in the death of Mr. Nellums. The conspiracy arose before the shooting, at the time the defendant and Darlene planned the killing and prepared the gun and the scene of the crime. The acts which established the conspiracy also laid the basis for the defendant's accountability. The defendant became accountable when Darlene shot her stepfather—the shooting was the act which transformed the defendant's liability from only conspiracy to commit murder to accountability for the killing (the jury later finding the killing was manslaughter).

■ The question, then, is whether a defendant can be convicted of both conspiracy to commit murder and manslaughter by accountability for separate actions occurring in the same sequence of events or transaction.

Conspiracy is defined by statute as follows:

> "A person commits conspiracy when, with intent that an offense be committed, he agreed with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator." (Ill. Rev. Stat. 1981. ch. 38, par. 8—2.)

The essential elements of conspiracy to commit murder are intent to commit murder, agreement to do so, and an act in furtherance of the agreement. (*People v. Ambrose* (1975), 28 Ill. App. 3d 627.) It is not necessary the act result in an offense (*Ambrose*), or the intended offense be accomplished. (*People v. Burleson* (1977), 50 Ill. App. 3d 629.) Accountability, on the other hand, requires the commission of an offense, and not just an act in furtherance of an offense. (Ill. Rev. Stat. 1981, ch. 38, par. 5—1.) A defendant cannot be accountable for

an offense which never occurred. Although a defendant can be responsible for an unintended crime which was the natural consequence of the intended crime. *People v. Campbell* (1979), 77 Ill. App. 3d 804; *People v. Cvetich* (1979), 73 Ill. App. 3d 580.

A person is legally accountable for the conduct of another when:

"Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c).)

The elements of accountability for manslaughter also include, among others, intent to commit an offense—in this case they intended murder—agreement to do so and an act, plus the commission of an offense. (*People v. Bell* (1981), 96 Ill. App. 3d 857.) It is possible for all the elements of a conspiracy charge to be included in an accountability charge. Nevertheless, the supreme court has decided that, when determining whether an offense is a lesser included offense of another, the court must not just look to the statutory terms of the offense; rather, the court must also look to the elements of the offenses as expressed in the indictments.

In *People v. Stroner* (1983), 96 Ill. 2d 204, the supreme court held that conspiracy to commit murder was not a lesser included offense of attempted murder on an accountability theory *as charged by the indictment*. The supreme court noted that the accountability indictment only charged the defendant with aiding and abetting his accomplice. There was not a specific allegation of "agreement" between the accomplices. In the instant case, the indictment for accountability also omits a specific allegation of "agreement." The *Stroner* holding seems to apply to the instant case. However, upon closer examination, the cases are distinguishable, and our decision shall be based upon different legal grounds. In the instant case, the defendant was convicted of *manslaughter* by accountability, not *attempted murder* by accountability. Without determining whether conspiracy to commit murder is a lesser included offense of manslaughter by accountability, we hold, for the following reasons, the conspiracy conviction must be vacated.

It must be noted that accountability is a legal theory whereby a defendant is held responsible for a crime (for example murder) which he personally did not commit, but which was committed by his accomplice. (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 850.) In the eyes of the law the defendant is the killer and can be given the maximum sentence which could be given to the actual murderer. (Compare *People v. Ruiz* (1982), 94 Ill. 2d 245 (death penalty upheld where defend-

ants present, even though they did not actually strike the fatal blows), with *People v. Tiller* (1982), 94 Ill. 2d 303 (death sentence set aside where defendant did not plan or participate in the killings).) If the law places upon the accountable defendant all the liabilities arising from the acts of the accomplice, the law should also afford the accountable defendant the protections which would be afforded the accomplice. Thus, if an accomplice is charged with conspiracy to commit murder and murder, the court cannot properly convict the accomplice of both crimes because the conspiracy charge is the inchoate crime of the murder charge. (Ill. Rev. Stat. 1981, ch. 38, par. 8—5; *People v. Hill* (1980), 78 Ill. 2d 465, 476.) Likewise, the accountable defendant, essentially standing in the shoes of the accomplice, should only be convicted of murder and not also the inchoate crime of conspiracy to commit murder.

Therefore, we hold that the defendant, Melanie K. Skiles, convicted of manslaughter by accountability, and manslaughter being an included offense of murder (*People v. Washington* (1972), 7 Ill. App. 3d 427), cannot also be convicted of the inchoate crime of conspiracy to commit murder. The conviction for conspiracy to commit murder is vacated.

Defendant separately argues the lower court abused its discretion by not considering the disposition of Darlene's case at the sentencing hearing. *People v. Hobbs* (1965), 56 Ill. App. 2d 93, 98, clearly states the rule that on "appeal, it is only under rare and unusual circumstances that a reviewing court will interfere with the discretion of the trial judge in the imposition of a sentence. *** The imposition of sentence is peculiarly within the discretion of the trial court, and unless clearly abused, the reviewing court will not interfere therewith. Accordingly, before an Appellate Court will interfere, it must be manifest from the record that the sentence is excessive and not justified by any reasonable view which might be taken of the record. [Citations.]" First and foremost, it must be borne in mind that Darlene Nellums was a juvenile and prosecuted as a juvenile. Melanie Skiles was an adult and was prosecuted as an adult. Melanie Skiles, because of her age, was not eligible for prosecution as a juvenile. Because of this material difference in circumstances, comparison of their respective dispositions is meaningless. Moreover, considering the defendant's extensive involvement in the killing, and the fact the court sentenced her to a four-year sentence for voluntary manslaughter (the minimum sentence, at the time, was three years, the maximum 15 years), we find there was not an abuse of discretion by the trial judge.

We are also asked to determine whether the trial judge com-

mitted prejudicial error when he allowed the State to play the taped confessions which included two of the defendant's statements of a willingness to take a polygraph examination. The defendant is correct when she states that polygraph evidence cannot be admitted into evidence. (*People v. Baynes* (1981), 88 Ill. 2d 225, 240.) However, the issue here does not concern polygraph test evidence. No one, at trial, attempted to introduce polygraph test evidence. And, the trial court never suggested that a polygraph test should be taken. This court knows of no bar to the admission into evidence of a defendant's statement of a willingness to take a polygraph test. Moreover, there is no indication the statements prejudiced the defendant. Apparently, the defendant offered to submit to a polygraph exam in order to support her claim to the investigating police officers that the version of the story she was giving on the tape was indeed, as she also claimed, the "honest to God's truth." The first statement was purely spontaneous on the part of the defendant. The second was a "yes" answer to the question "would you be willing to take a polygraph to this statement?" At trial, the defendant never attempted to show that the taped confessions were untrue or incomplete. Furthermore, the State did not single out the statements as a basis for the conviction. They were incidental to the confessions and were heard by the jury in the course of playing the entire tape. Error was not committed by playing the defendant's statements.

The remainder of the defendant's allegations of error can be dealt with summarily. The lower court did not err in refusing to instruct the jury on the offense of obstruction of justice because this crime is not an included offense of those charged. (*People v. Cramer* (1981), 85 Ill. 2d 92.) It was appropriate for the trial judge to add the language of the accountability instruction to the issues instruction. (*People v. Comer* (1979), 78 Ill. App. 3d 914, 916.) Lastly, defendant's contention that the prosecutor improperly argued motive to the jury, not being objected to, was not properly preserved in the record for appeal. Moreover, the "real thrust of the evidence adduced and argued by the State, in terms of quantity and persuasiveness, was independent of motive." *People v. Jackson* (1974), 22 Ill. App. 3d 873, 879, 318 N.E.2d 239.

The dissenting opinion filed herein brings to mind a colloquy reputed to have occurred many years ago between the Chief Justice of Texas and an Illinois lawyer visiting that State. "Why is it," the visiting lawyer asked, "that you routinely hang horse thieves in Texas but oftentimes let murderers go free?" "Because," replied the Chief Justice, "there never was a horse that needed stealing!"

While some might agree that the victim in the instant case deserved to be shot, such premise falls short of a legal justification for the defendant's conduct.

For the reasons set forth above, we reverse the conspiracy conviction and vacate that sentence. The conviction and sentence for manslaughter is affirmed.

Affirmed in part; reversed in part.

ALLOY, J., concurs.

JUSTICE SCOTT, dissenting:

Henry Nellums, an avid collector and seller of pornographical material, commenced a weekly incestuous relationship with his adoptive daughter, Darlene Nellums, when she was eight years old. He continued this relationship until Darlene was 14 years of age. Darlene effectively ended Nellums' incestuous conduct on January 3, 1981, when she shot and killed him. Darlene was prosecuted as a juvenile, made a ward of the court and placed on probation.

Judy Nellums, natural mother of Darlene, was aware of her daughter's plans to kill her husband, Henry Nellums, and gave her daughter permission to do so shortly before the act was committed. Judy was never prosecuted.

The defendant, Melanie K. Skiles, was 18 when the crime was committed, was aware of Darlene's intentions, and at Darlene's request stood behind her when the fatal shot was fired. Melanie, as stated in the majority opinion, was tried and convicted of conspiracy to commit murder and on an accountability theory of voluntary manslaughter. She was sentenced to concurrent terms of four years' imprisonment on each conviction.

Was the foregoing scenario of events legal? Yes, but fair? No! This observation as to the legality of the defendant Skiles' conviction is premised upon the assumption that the defendant received a fair trial, which the majority has concluded she received. I disagree with such a conclusion.

Reversible error was committed when the State over defendant's objection was permitted to introduce evidence of the defendant's willingness to submit to a polygraph examination regarding two narrative statements which she had made.

The defendant filed a motion *in limine* requesting the trial court to exclude all testimony regarding a polygraph examination and this motion was allowed. The defendant during trial further requested that

all references as to her willingness to take a polygraph examination be deleted from recorded and transcribed narratives which she had made and which the State was attempting to introduce into evidence. This motion was opposed by the State with the argument that the expressions of such willingness to take a lie detector test showed that the defendant's statements were true.

The jurors heard two recorded narratives given by the defendant and were further given transcripts of the narratives so that the same could be read as the tape was being played.

The jury heard the narrative of the defendant given to the law enforcement officials at 4:46 p.m. on January 5, 1981, a portion of which is as follows:

"S.A. [Special Agent]: Okay, Melanie, as you know, this is the third statement we have taken from you. And each time the statement has been different.

M.S.: Yes.

\* \* \*

M.S.: \*\*\* What I am telling you now is the honest to God's truth and I would take a polygraph test right now and swear to it. And I know it would come out positive."

At 11:59 p.m. on the same date the defendant gave a second narrative which was also heard by the jury and a portion of which is as follows:

"H.B. [initials of investigator]: Have we promised you anything?

M.S.: No.

H.B.: Okay, would you be willing to take a polygraph to this, to this statement?

M.S.: Yes, yes, I would."

Almost seven hours later the defendant gave another narrative to a special agent Brignadello, who prefaced the statement with the following remarks:

"H.B.: Melanie, I understand that at this point, you have some things that you would like to tell us that were asked before in a previous statement and were not quite accurate. At this point you would like to tell the complete truth, is that correct?

M.S.: Yes."

The foregoing narratives listened to and read by the jurors were subject to strenuous objections by counsel for the defendant, however, these objections were overruled. It was the State's position that the objected-to evidence (defendant's declarations of a willingness to take

a polygraph examination) bolstered the credibility of her narratives. The State's position is well taken; however, the State was trodding on forbidden ground. The inference from such evidence was that the defendant's initial stories were false and that the final statement introduced by the State was true and proven to be true by a polygraph examination. Our supreme court, referring to evidence relating to a polygraph examination, has stated, "No other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination." (*People v. Baynes* (1981), 88 Ill. 2d 225, 244, 430 N.E.2d 1070, 1079.) In *Baynes* admission of polygraph evidence was stipulated to by the parties, yet our supreme court held that the use of such evidence rose to the level of plain error and reversed the defendant's conviction even though it was recognized that the evidence against the defendant was not close. Our supreme court recently reversed a defendant's conviction where the trial judge, following a guilty verdict, mentioned the possibility of giving the defendant a polygraph examination prior to the time the judge ruled on a motion for new trial, even though the judge stated that he did not want to know the result of the examination or even if one was conducted. (See *People v. Yarbrough* (1982), 93 Ill. 2d 421, 444 N.E.2d 493.) In *Yarbrough* the prosecutor during hearing on motion for new trial did refer to "certain investigative procedures" as having been "performed subsequent to the trial." Our supreme court in reversing defendant's conviction reasoned that the judge could have inferred that the defendant had taken the examination and that the results were not beneficial to him. The same reasoning is applicable in the case before us in that it can be assumed that the jury concluded that the defendant had taken a lie detector test and the results were not beneficial to her.

The precise question presented in this case, to-wit, evidence of a defendant's willingness to take a lie detector test, has not been precisely addressed in our State; however, other jurisdictions have been confronted with the issue and have held that such evidence constitutes reversible error because it lacks probative value and it is of a self-serving nature. See *State v. Carnegie* (1969), 158 Conn. 264, 259 A.2d 628, *cert. denied* (1969), 396 U.S. 992, 24 L. Ed. 2d 455, 90 S. Ct. 488; *People v. Rocha* (1981), 110 Mich. App. 1, 312 N.W.2d 657; and precisely on all fours with the instant case is *State v. Britson* (1981), 130 Ariz. 380, 636 P.2d 628.

The majority opinion disposes of the issues regarding the admission of evidence relating to defendant's willingness to take a polygraph examination by noting that the defendant's statements to that

effect were spontaneous. I quarrel not with the fact that the defendant made the statements during a prolonged investigation by law enforcement officials. Such statements were contained in the narratives both heard and read by the jury. The State could well have introduced into evidence the narratives minus the defendant's remarks pertaining to her willingness to take a polygraph examination. The State in attempting to "gild the lily" obtained the opposite result in that reversible error was committed which mandates a new trial.

I also differ with that portion of the majority opinion which concludes that no error was committed by the trial court when it ruled that the mental health records of Darlene Nellums, the principal actor, were privileged under the provisions of the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1979, ch. 91½, par. 801 et seq.).

An assistant to the Attorney General of our State prosecuted this case and presented oral arguments to this court on appeal. I agree with the majority opinion in that this court was informed by the State during oral argument that the mental health report in dispute was given to counsel for the defendant, that it was contained in the record on appeal and hence we could examine it and we would find it irrelevant. I further agree with the observation of the majority that such statement was not true. The defense counsel despite repeated requests never received such a report and the same is not part of the record. I disagree, however, with the majority's conclusion that the failure to produce the material in the possession of the Department of Mental Health was of no consequence.

The principal actor, Darlene Nellums, who killed her father, agreed to undergo psychiatric treatment as a condition of her probation, and such treatment was ordered by the court. Information obtained from Darlene contained in reports prepared by the Illinois State Psychiatric Institute was filed with the juvenile court and the State's Attorney. Dr. Lani of the Institute testified as to confidential statements Darlene had made at the juvenile dispositional hearing, a hearing which counsel for the defendant was not permitted to attend. Whether there was material in the psychiatric reports which would have been beneficial to the defendant's defense was not known to counsel for the defendant, nor to this court. Darlene did not testify at the trial, nor were her whereabouts disclosed to the defendant.

Whether a disclosure would have been beneficial to the defendant is a determination that should have been made by counsel for the defendant. The statutory psychiatrist-patient privilege does not apply to a psychiatric examination made pursuant to a court order. *People*

*v. English* (1964), 31 Ill. 2d 301, 201 N.E.2d 455; *People v. Lowe* (1969), 109 Ill. App. 2d 236, 248 N.E.2d 530.

Presumably the patient in psychotherapeutic treatment reveals the most private and secret aspects of his mind and soul. To casually allow public disclosure of such would desecrate any notion of an individual's right to privacy. Confidentiality encourages candor from the patient which is necessary for proper treatment; however, in the instant case we have a situation where there must be a determination of which is to be given the most weight, the right of confidentiality or the rights guaranteed to an accused by the sixth amendment of the United States Constitution and the right not to be deprived of liberty without due process of law. As the result of confidential information concerning Darlene having been provided to third parties, it may well be that such acts constituted a waiver of the privilege of confidentiality. (*People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592; *People v. Givans* (1967), 83 Ill. App. 2d 423, 228 N.E.2d 123.) However, a broader solution to the problem should be adopted. When a statutory evidentiary privilege directly conflicts with a defendant's right of confrontation and due process, the statutory privilege must give way to the fundamental protections of our system of criminal justice. *People v. Phipps* (1981), 98 Ill. App. 3d 413, 424 N.E.2d 727; *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.

It should also be noted that in this case the defendant by her attorney sought but did not receive the known address of Darlene Nellums. At one time the State was directed to supply the address. The State did not promptly comply with this request and ultimately, after being informed by third parties that Darlene did not wish to testify, the court entered an order denying the defendant's request for the address. Counsel for defendant was denied the right to make his own determination as to whether Darlene did or did not want to testify and such denial was based upon hearsay statements. Whether Darlene did or did not want to testify is immaterial. Her address should have been produced. Her whereabouts could lead to other acquaintances or other people in contact with Darlene which could conceivably enable counsel for defendant to better investigate and prepare her defense. See *People v. Bass* (1980), 84 Ill. App. 3d 624, 405 N.E.2d 1182, and *People v. Szabo* (1983), 94 Ill. 2d 327, wherein there is contained an informative dissertation on the importance of compliance with discovery procedure.

For the reasons set forth I believe that the conviction of the defendant should be reversed and a new trial should be ordered.