(No. 54082.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EVERETT BAYNES, Appellant.

*Opinion filed December 4, 1981.—Rehearing denied January 29, 1982.*

228

MORAN, J., concurring in the judgment.

John H. Reid, Deputy Defender, and Richard J. Bennett, Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Fred E. Inbau and Charles F. Marino, Special Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

On February 19, 1978, at approximately 1:30 a.m., Michael Walsh, driving along a country road in Monroe County in a 1972 pickup truck, had an accident. Walsh and his companions were driven to the hospital in a car which had been following them, and the pickup truck was left alongside the road. When Walsh returned to his truck the next day he discovered a tachometer, two stereo speakers and three tires missing.

The defendant, Everett Baynes, was charged with burglary of the tachometer and burglary and misdemeanor theft of the two stereo speakers. Following a plea of not guilty the defendant was tried by a Monroe County jury on

May 15, 1978. He was found guilty of one count of burglary of the tachometer and was acquitted on the other count of burglary and the count of misdemeanor theft of the stereo speakers. On August 31, 1978, he was sentenced to a five-year term of imprisonment.

Prior to trial the defendant took a polygraph examination pursuant to a stipulation signed by the State's Attorney, defense counsel and the defendant. The trial court received into evidence the testimony of a polygraph examiner who stated that in his opinion the defendant was not telling the truth when he answered certain relevant questions during a polygraph examination. The defendant made no objection to the examiner's testimony at trial or in his post-trial motion. The appellate court found that such testimony did not have an obvious prejudicial impact on the jury and did not constitute reversible error. The court affirmed the conviction. (87 Ill. App. 3d 1000.) The defendant appealed that judgment, and we granted leave to appeal.

It is a general rule that an objection to the introduction of evidence must be made at the time of admission or it will be treated as waived. (*People v. Roberts* (1979), 75 Ill. 2d 1, 6; *People v. Williams* (1963), 28 Ill. 2d 114, 116; *People v. Arnold* (1963), 27 Ill. 2d 294, 297; *People v. Luckett* (1962), 24 Ill. 2d 550, 554.) If the error is not raised in a post-trial motion it is waived on appeal. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177; *People v. Foster* (1979), 76 Ill. 2d 365; *People v. Edwards* (1978), 74 Ill. 2d 1, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862.) However, this rule is one of administration and does not operate as a jurisdictional bar. (*People v. Burson* (1957), 11 Ill. 2d 360, 370.) Error that rises to the level of plain error is considered by this court despite the defendant's failure to record objections and properly preserve the record for review. *People v. Jackson* (1981), 84 Ill. 2d 350, 359.

One purpose of the plain error rule is to afford certain protections to the accused. In order to prevent a serious

injustice being done to a defendant, the error should be corrected. The other purpose of the plain error rule is to protect and preserve the integrity and reputation of the judicial process.

Objections must be recorded to be properly preserved for review. (*People v. Coles* (1979), 74 Ill. 2d 393.) If a party does not adhere to that rule he has effectively waived his rights to appeal where there has been no indication that the party found fault with the admissibility of the evidence at the time of trial. If the admission of evidence constitutes plain error resulting in a miscarriage of justice upon a defendant or a tainting of the integrity and reputation of the judicial process, then it is considered although such error was not brought to the attention of the trial court. Thus the plain error rule works, in fact, as an exception to the waiver rule which is invoked upon a party's failure to conform to a primary rule of appellate procedure. Rule 615(a) states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (73 Ill. 2d R. 615(a).) To circumvent the general waiver rule the record must clearly show the commission of an error that substantially affected a defendant's rights. *People v. Jackson* (1981), 84 Ill. 2d 350, 359; *People v. Foster* (1979), 76 Ill. 2d 365, 380; *People v. Coles* (1979), 74 Ill. 2d 393, 397.

This court may exercise its discretion in taking notice of errors which deprive the accused of a fair and impartial trial. (*People v. Pickett* (1973), 54 Ill. 2d 280.) The court must ask, even in the absence of objection at trial, if the defendant was prejudiced to the extent that he was prevented from receiving a fair trial. If so, error may be considered. (*People v. Jackson* (1981), 84 Ill. 2d 350.) To determine whether the defendant was prevented from receiving a fair trial the court evaluates the evidence to see if it is close. No court wants to take a chance that an innocent person may have been convicted by an obvious

error which was not preserved for the reviewing court. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576; *People v. Pickett* (1973), 54 Ill. 2d 280; *People v. Bradley* (1964), 30 Ill. 2d 597.) In its review under this analysis the court must weigh evidence to see if it is closely balanced.

Everett Baynes was convicted of burglary under a theory of accountability. The chief witnesses for the State were David McCoombe and Mark Barnett, both of whom implicated the defendant, and both of whom were also charged with offenses involving the disabled truck. The charge against McCoombe was reduced from felony burglary to misdemeanor theft. McCoombe was to pay a $200 fine plus court costs. The record does not show Barnett's plea. It does, however, show that his jail sentence amounted to three days. As participants in the crime the testimony of these accomplices must be examined carefully and cautiously. (*People v. Wilson* (1977), 66 Ill. 2d 346.) Their statements will be looked upon with distrust upon review. *People v. Lindgren* (1980), 79 Ill. 2d 139, 142.

According to the testimony of McCoombe and Barnett it was at the direction of the defendant that McCoombe climbed into the cab of the pickup truck and removed the tachometer. The defendant was positioned down the road at his grandfather's house as a lookout. Prior to the incident, police officer John Koch, investigating the accident, engaged in conversation with the defendant (whom he knew socially). This occurred shortly after the mishap at the scene of the accident. The defendant commented that the tachometer "would look good in his car." Koch responded that "it would look good in the police car or any other car." Later on February 19, 1979, Koch stopped the defendant after he had spun his tires leaving a local gas station. Koch asked the defendant if he knew anything about the tachometer or other items taken from the truck. Baynes responded that he knew where it was but would not tell Koch where. Still later the same day, Baynes brought the tachometer to Koch and

told the police officer he had retrieved it from the trunk of a car. The defendant did not identify the car's owner.

When the defendant brought the tachometer in, the deputy sheriff advised Baynes of his *Miranda* rights and then questioned him. The defendant said that he was parked a short distance down the road when McCoombe drove by and waved the tachometer to him; after that Officer Koch had asked him to bring in the tachometer, and the defendant removed it from a styrofoam cooler in McCoombe's car.

The polygraph examination in question occurred on April 14, 1978, pursuant to a stipulation that the results would be admissible. The examiner testified that the following pertinent questions were asked:

> (1) "On or about February 19, 1978, did you show anyone the speakers that had been stolen from the overturned truck?"

> (2) "On or about February 19, 1978, did you have in your possession the speakers that were stolen from the overturned truck?"

> (3) "On or about February 19, 1978, did you tell McCoombe to take the tach from the overturned truck?"

> (4) "Besides the keys, did you remove anything else from that overturned truck?"

To each question the defendant answered no. In the opinion of the examiner none of the defendant's answers were truthful. The credibility of the prosecution's witnesses is important, and the polygraph evidence directly enhanced the statements of McCoombe and Barnett that it was at Everett Baynes' direction that the burglary took place. However, we do not find the evidence so closely balanced as to persuade us the alleged error be considered. It is not necessary to reach the substance of the complained-of error, here, under the first part of the plain error test.

This court will take notice of errors so fundamental that the court considers them to protect and preserve the

integrity and reputation of the judicial process. Under this part of the test it is necessary to review our treatment of polygraph evidence to determine whether or not the admission of the examiner's testimony, despite the stipulation, constitutes plain error. To provide a foundation we begin by describing the polygraph examination.

i. The polygraph examination

In 1895 the Italian physiologist Cesare Lombroso was recognized as the first person to use a method involving blood pressure to ascertain guilt or innocence. By 1924 an "inspiration and expiration" recorder was added. By 1922 a "cardiopneumopsychogram" introduced the modern technique of recording a person's responses to stimuli. Those supposedly involuntary reactions were then measured and evaluated by experts. (Forkosch, *The Lie Detector and Mechanical Jurisprudence*, 28 Okla. L. Rev. 288, 299 (1975).) In 1923 the District of Columbia Court of Appeals described the "systolic blood pressure description test":

> "It is asserted that blood pressure is influenced by change in the emotions of the witness, and that the systolic blood pressure rises are brought about by nervous impulses sent to the sympathetic branch of the autonomic nervous system. Scientific experiments, it is claimed, have demonstrated that fear, rage, and pain always produce a rise of systolic blood pressure, and that conscious deception or falsehood, concealment of facts, or guilt of crime, accompanied by fear of detection when the person is under examination, raises the systolic blood pressure in a curve, which corresponds exactly to the struggle going on in the subject's mind, between fear and attempted control of that fear, as the examination touches the vital points in respect of which he is attempting to deceive the examiner.
>
> In other words, the theory seems to be that truth is spontaneous, and comes without conscious effort, while the utterance of a falsehood requires a conscious effort, which is reflected in the blood pressure. The

rise thus produced is easily detected and distinguished from the rise produced by mere fear of the examination itself. In the former instance, the pressure rises higher than in the latter, and is more pronounced as the examination proceeds, while in the latter case, if the subject is telling the truth, the pressure registers highest at the beginning of the examination, and gradually diminishes as the examination proceeds." *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, 1013-14.

The systolic-blood-pressure test was a forerunner to today's polygraph. The basic technique and theory have not dramatically changed since the 1920's. The polygraph measures and records blood pressure changes, respiration changes, pulse changes and changes in the skin's resistance to electricity. It too operates on the principle that the autonomous nervous system will respond to stressful conditions and that sympathetic parts of that system will respond involuntarily. (J. Reid & F. Inbau, Truth and Deception: The Polygraph (Lie Detection) Technique 216-50 (2d ed. 1977).

The polygraph's scientific basis has been questioned. According to Professor Jerome Skolnick: "There seems to be little evidence that upholds the claim to a regular relationship between lying and emotion; there is even less to support the conclusion that precise inferences can be drawn from the relationship between emotional change and physiological response." Skolnick, *Scientific Theory and Scientific Evidence, An Analysis of Lie-Detection,* 70 Yale L.J. 694, 727 (1961) (hereafter Skolnick).

The polygraph's attempts to measure automatic physiological responses are influenced by variables which are not a function of the subject's guilt or innocence. (Lykken, *Psychology and the Lie Detection Industry,* 29 Am. Psychologist 725, 730 (1974).) The interactions between the subject and the examiner are subtle. The results are subject to conscious or unconscious manipulation. The measure-

ment of physiological responses may be complicated by the tension of the subject or his spontaneous autonomic activity. (Skolnick, 70 Yale L.J. 694, 701 (1961).) A variety of other factors can influence the reliability of the measured physiological response. Included are: abnormal blood pressure, heart and respiratory irregularities, fatigue, intoxication, rationalization, extreme nervousness, meditative abstraction, controlled breathing, instrument discomfort, uncomfortable room temperature, obesity, hidden muscular contractions, self-inflicted pain, mental incompetence, psychopathy or schizophrenia, ingestion of a sedative, an attempt to suppress a cough, fear induced by suspicion or accusation, or lack of fear of detection. Note, *Polygraphy: Short Circuit to Truth?*, 29 U. Fla. L. Rev. 286, 296-97 (1977).

While estimates of the machine's accuracy vary from 70% (Burkey, *The Case Against the Polygraph,* 51 A.B.A. J. 855, 856 (1965), to approximately 86% (J. Reid & F. Inbau, Truth and Deception: The Polygraph Technique 395-98 (2d ed. 1977)), both opponents and proponents agree that the efficacy of the polygraph examination depends upon the examiner's interpretation of the machine's graphs. This in turn depends upon the qualifications of the operator. (Inbau & Reid, *The Lie Detector Technique: A Reliable and Valuable Investigative Aid,* 50 A.B.A. J. 470 (1964); Skolnick, 70 Yale L.J. 694 (1961).) In almost two-thirds of polygraph examinations, responses are subtle in their appearance and require a "highly skilled" and "well trained examiner." (Horvath & Reid, *The Reliability of the Polygraph Examiner Diagnosis of Truth & Deception,* 62 J. Crim. L. Criminolgy and Police Science 276, 278 (1971).) Thus to a large extent the ultimate conclusions of the examination are dependent upon the subjective opinion of each examiner's interpretation. J. Reid & F. Inbau, Truth and Deception: The Polygraph Technique 215-20 (2d ed. 1977); Radek, *The Admissibility of Polygraph Results in Criminal*

*Trials: A Case for the Status Quo*, 3 Loy. Chi. L.J. 289, 296 (1972).

ii. History of polygraph evidence in Illinois

This court last addressed the issue of polygraphs in *Illinois Polygraph Society v. Pellicano* (1980), 83 Ill. 2d 130. In that case this court concluded that "[the] Act to provide for licensing and regulating detection of the deception examiners * * *" (the Act) (Ill. Rev. Stat. 1975, ch. 38, par. 202—1 *et seq.*, now Ill. Rev. Stat. 1979, ch. 111, par. 2401 *et seq.*) does "not offend the special legislation clause of the Illinois Constitution." (*Illinois Polygraph Society v. Pellicano* (1980), 83 Ill. 2d 130, 145.) The plaintiffs in *Illinois Polygraph Society* sought to enjoin the defendant (not licensed under the Act) from conducting detection-of-deception examinations or from representing himself as a detection-of-deception examiner. In upholding the Act we commented that "[t]here is still enough doubt about the reliability of detection-of-deception instruments, and the varying expertise of those who use them, to justify the General Assembly's decision to set minimum standards which prefer one instrument over another." (83 Ill. 2d 130, 139.) We went on to say that doubt was cast on the instrument's reliability in the enactment of the Act forbidding the use of results from lie-detection devices in criminal trials (Ill. Rev. Stat. 1977, ch. 38, par. 155—11). 83 Ill. 2d 130, 139.

Statute provides:

"In the course of any criminal trial the court shall not require, request or suggest that the defendant submit to a polygraphic detection test, commonly known as a lie detector test to questioning under the effect of thiopental sodium or to any other test or questioning by means of any mechanical device or chemical substance." Ill. Rev. Stat. 1977, ch. 38, par. 155—11.

A more precise interpretation of the preceding provision is that the General Assembly forbids any request, requirement or suggestion on the part of the court that the defendant submit to an examination. This section does not necessarily preclude an agreement by the defendant and prosecutor that the defendant undergo a polygraph examination prior to trial. The provision is, however, a strong indication that the legislature distrusts the use of polygraph evidence in a criminal trial.

In both *People v. Vriner* (1978), 74 Ill. 2d 329, and *People v. Nicholls* (1969), 42 Ill. 2d 91, the defendants attempted to introduce exculpatory evidence in the form of a polygraph examiner's statement. In both instances the defendants entered into no agreement with the prosecutor that they would take polygraph tests and there was no understanding that any results from a test would be admissible at trial. In *Nicholls,* in dismissing the defendant's contention that failure to admit the polygraph examiner's testimony was error, the court recalled its consistent holdings that "the results of a polygraphic examination cannot properly be introduced as evidence either of guilt or innocence of an accused." 42 Ill. 2d 91, 97, citing *People v. Zazzetta* (1963), 27 Ill. 2d 302.

The facts of *People v. Zazzetta* are more similar to the case at hand. There the defendant asserted that the trial court erred in admitting the results of a lie-detector test into evidence. While the defendant had agreed to take the test, he did so without the benefit of counsel. The court concluded that it would be "manifestly unfair to bind him by a stipulation regarding the trustworthiness of scientific opinion far beyond his expected ken." 27 Ill. 2d 302, 309.

The court pointed out that there had not been a scintilla of evidence introduced regarding the qualifications of the examiner or the method of testing, and there had been no opportunity for the defendant to cross-examine the examiner who had concluded that defendant lied. (27 Ill. 2d 302,

309.) In the case at hand it appears that those evidentiary problems were overcome. The examiner testified as to his qualifications and the method of testing he employed, and the defendant's counsel had an opportunity to cross-examine the polygraph examiner. However, the primary obstacle in admission of polygraph evidence, stipulated to or not, has continually and consistently been the instrument's disputed scientific reliability. (*People v. Zazzetta* (1963), 27 Ill. 2d 302, 309; *People v. Potts* (1966), 74 Ill. App. 2d 301, 306; *People v. Monigan* (1979), 72 Ill. App. 3d 87, 92.) Because of the lack of procedural safeguards in *Zazzetta* this court was not compelled to take sides in the dispute. The facts of this case oblige us to do so.

A written and signed stipulation of the defendant and State's Attorney would normally foreclose review. (*People v. Pierce* (1944), 387 Ill. 608, 614; *People v. Malin* (1939), 372 Ill. 422, 423.) Parties who agree to certain terms are estopped from later objecting to the terms of that agreement. Generally, neither can complain of evidence stipulated into the record (*People v. Polk* (1960), 19 Ill. 2d 310, 315; *Kazubowski v. Kazubowski* (1968), 93 Ill. App. 2d 126, 134.) The admissibility of a polygraph examination's results, however, is different and must be treated as such. Other jurisdictions' holdings on the admissibility of polygraph testimony despite a stipulation turn upon respective courts' assessments of the examination's probative value and acceptability.

If the instrument is accurate and the recording of the instrument's results reliable, then we should conclude it is acceptable. But the process has not reached a level of sophistication that makes it generally more probative than prejudicial. A stipulation does not necessarily make inadmissible evidence admissible. By what logic should stipulated polygraph evidence be admitted if the same evidence, absent a stipulation, is barred? How does the agreement lend credibility to an examination that would not otherwise

be given judicial recognition? If evidence is unreliable, agreeing to its admission does not make it reliable. Even proponents of the admission of polygraph recognize that "the distinction between 'reliable enough for a stipulation' and 'reliable enough for trial' is simply not meaningful. * * * [I]t cannot be logically argued that any 'foundation' as to accuracy is achieved by stipulation." Tarlow: *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System,* 26 Hastings L.J. 917, 955-56 (1975).

A stipulation can admit facts but cannot change the law. (*Los Angeles Ship Building & Drydock Corp. v. United States* (9th Cir. 1961) 289 F.2d 222, 231.) The law is that polygraph evidence is not admissible in the State of Illinois. At trial, evidence of the polygraph was admitted by virtue of a stipulation. This evidence would not have been considered reliable enough for admission absent the stipulation. The stipulation attempts to change the legal standard for admissibility. This court cannot accept such a result.

Our holding today is in accord with the majority of jurisdictions. It is also consistent with the most recent results reached by our sister States.

iii. Development in other jurisdictions

Almost all courts refuse to admit unstipulated polygraph evidence because there remain serious doubts about the reliability and scientific recognition of the tests. (*E.g. United States v. Frogge* (5th Cir. 1973), 476 F.2d 969, 970; *United States v. Urquidez* (C.D. Cal. 1973), 356 F. Supp. 1363; *United States v. Wilson* (D. Md. 1973), 361 F. Supp. 510.) A majority of jurisdictions that have addressed the issue have also held that polygraph results without further substantial procedural safeguards are inadmissible, notwithstanding a written stipulation of admissibility. (*State v. Corbin* (La. 1973), 285 So. 2d 234; *Fulton v. State* (Okla. Crim. App. 1975), 541 P.2d 871; *Lewis v. State* (Tex. Crim. App. 1973), 500 S.W.2d 167; *Pulakis v. State* (Alaska 1970),

476 P.2d 474, 479; *State v. Gagne* (Me. 1975), 343 A.2d 186, 192; *People v. Ranes* (1975), 63 Mich. App. 498, 502, 234 N.W.2d 673, 676; *Harrison v. State* (Miss. 1975), 307 So. 2d 557, 562; *State v. Steinmark* (1976), 195 Neb. 545, 548, 239 N.W.2d 495, 496-97; *Commonwealth v. Gee* (1976), 467 Pa. 123, 142, 354 A.2d 875, 884; *State v. Watson* (S.D. 1976), 248 N.W.2d 398, 399; *Robinson v. State* (Tex. Crim. App. 1977), 550 S.W.2d 54, 59; *Jones v. Commonwealth* (1974), 214 Va. 723, 725, 204 S.E.2d 247, 248; *State v. Dean* (1981), 103 Wis. 2d 228, 307 N.W.2d 628.) The courts reason that if the rationale for exclusion is the inaccuracy of the test, it does not gain accuracy by a mere stipulation of the parties.

The District of Columbia Court of Appeals in *Frye v. United States* (1923), 293 F. 1013, was the first to grapple with the issue of the admissibility of polygraph evidence:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Frye v. United States* (1923), 293 F. 1013, 1014.)

There have been considerable improvements in instrumentation and technique since the first decision was handed down. In *State v. Valdez* (1962), 91 Ariz. 274, 283, 371 P.2d 894, 900, the Arizona court found that the machine had "developed to a state in which its results are probative enough to warrant admissibility upon stipulation." Polygraph evidence was found to be admissible provided:

> "(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the ex-

aminer's opinion thereon on behalf of either defendant or the state.

(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

a. the examiner's qualifications and training;

b. the conditions under which the test was administered;

c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given." (*State v. Valdez* (1962), 91 Ariz. 274, 283-84, 371 P.2d 894, 900-01.)

The Wisconsin Supreme Court adopted an adaptation of the *Valdez* formula in 1974. The court found that when a polygraph examination is properly conducted and interpreted the results are sufficiently indicative of truthful and deceptive responses. Admission is justified if the parties agree to comply with certain preconditional safeguards. (*State v. Stanislawski* (1974), 62 Wis. 2d 730, 741, 216 N.W.2d 8, 14.) Other jurisdictions followed *Valdez* in allowing admission upon a valid stipulation. See, *e.g.*, *State*

*v. Galloway* (Iowa 1969), 167 N.W.2d 89; *State v. Lassley* (1976), 218 Kan. 758, 760, 545 P.2d 383, 385; *State v. McDavitt* (1972), 62 N.J. 36, 44-47, 297 A.2d 849, 853-55; *State v. Souel* (1978), 53 Ohio St. 2d 123, 133, 372 N.E.2d 1318, 1323.

The *Valdez* and *Stanislawski* cases admit the inherent deficiencies of the polygraph. Each is an attempt to balance the polygraph's known limited reliability with sufficient safeguards. The Wisconsin Supreme Court in *State v. Dean* (1981), 103 Wis. 2d 228, 307 N.W.2d 628, demonstrates that those safeguards are not sufficient. While the interrogation can be carefully arranged and closely supervised, the recordings cannot be interpreted with the degree of accuracy that would render them reliable enough for the court to accept them into evidence. In *State v. Dean* (1981), 103 Wis. 2d 228, 307 N.W.2d 628, the same court that adopted *Stanislawski* expressly overruled that case, finding it to be error for the trial court to admit stipulated polygraph results. The court in *Dean* recognized the inconsistency of admitting polygraph evidence on the basis of a stipulation since the stipulation does little if anything to enhance the reliability of polygraph evidence. Recalling *United States v. Wilson* (D. Md. 1973), 361 F. Supp. 510, the Wisconsin court found that cross-examination may not provide a sufficient basis for the jury to assess the merits of the test and competency of the witness.

> "The danger level rises geometrically because of the disproportionate influence the polygraph examination evidence inevitably will exercise, both because it is germane to the credibility on the ultimate finding and because of the consumption of time necessarily involved in examination, cross-examination and battle of experts. The specter of 'trial by polygraph' replacing trial by jury is more than a felicitious slogan." *United States v. Wilson* (D.Md. 1973), 361 F. Supp. 510, 513.

In conclusion, the court found the conditions of admissi-

bility promulgated in *Stanislawski* failed to protect the integrity of the trial process, "as they were intended to do." 103 Wis. 2d 228, 279, 307 N.W.2d 628, 653.

Admission risks confusion and prejudice. "The uncertain impact of polygraph evidence on a jury is a question of substantial concern." (103 Wis. 2d 228, 278, 307 N.W.2d 628, 653.) The Wisconsin court could not say that a limiting instruction would ensure that the jury put the polygraph evidence in proper perspective. (103 Wis. 2d 228, 238-39, 307 N.W.2d 628, 633.) We agree. There is significant risk the jury will regard such evidence as conclusive. It is the jury's function, as finder of fact, to determine the credibility of witnesses. A potential trial by polygraph is an unwarranted intrusion into the jury function. It is questionable whether any jury would follow limiting instructions because the polygraph evidence "'*** is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. * * *'" (103 Wis. 2d 228, 277, 307 N.W.2d 628, 652, quoting *United States v. Alexander* (8th Cir. 1975), 526 F.2d 161, 168; *United States v. Flores* (9th Cir. 1976), 540 F.2d 432, 439; see also *Commonwealth v. A. Juvenile* (1974), 365 Mass. 421, 447, 313 N.E.2d 120, 135 (Quirico, J., dissenting).

The admission of the polygraph evidence rose to the level of plain error. The error impinges upon the integrity of our judicial system. We reaffirm this court's position in *Zazzetta*. Polygraph evidence is not reliable enough to be admitted. The prejudicial effects substantially outweigh the probative value of admitting such testimony. As such "usefulness to the court and jury *** remains the same, regardless if they are admitted by stipulation or not." (*People v. Zazzetta* (1963), 27 Ill. 2d 302, 308.) There is nothing to show that jurors are better able to evaluate the testimony of polygraph examiners where both parties have stipulated that their testimony be heard. No other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination. The evi-

dence was wrongly admitted. Because of the potential impact and substantial influence of the polygraph evidence a new trial is in order. The appellate court and circuit court judgments are reversed. The cause is remanded for a new trial.

*Judgments reversed;*
*cause remanded.*

JUSTICE MORAN concurs in the judgment.