THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JESSE AVERY, Defendant-Appellant.

First District (1st Division)   No. 1—88—2408

Opinion filed September 30, 1991.—Rehearing denied January 23, 1992.

Randolph N. Stone, Public Defender, of Chicago (John T. Kennedy, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Howard D. Weisman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant Jesse Avery was found guilty of aggravated arson and two counts of murder in connection with a fire which occurred at 4109 West Madison Street on August 8, 1986. Defendant was sentenced to 40 years' imprisonment. Defendant now appeals, arguing that: (1) the trial court improperly admitted evidence concerning other crimes; (2) the trial court improperly admitted evidence of polygraph examinations taken by defendant and a witness; (3) the trial court conducted an investigation outside the record developed at trial; and (4) the State failed to prove him guilty of the charged offenses beyond a reasonable doubt. For the following reasons, we affirm.

THE TRIAL

The report of proceedings at defendant's trial indicates the following. Benjamin Scott testified that he lived at 4109 West Madison during the summer of 1986. Scott stated that he paid no rent to live there because he sold drugs on behalf of defendant. According to Scott, several months prior to August 8, 1986, defendant had offered him $5,000 to set fire to the building, half to be paid in advance. Scott further stated that defendant told him he wanted the building burned because he had $100,000 of insurance on it. Defendant told him to make sure that babies and young ladies were not in the building when it was to be burned. Scott testified that about a month before the alleged arson, defendant told the tenants in the building to buy fire insurance. Scott also testified that he refused this offer twice. Scott stated that the last time he spoke with defendant, several months before the alleged arson, nothing was said about a fire.

On cross-examination, Scott admitted to occasional use of cocaine and a prior conviction for armed robbery. He also stated that while he had moved out of the building several months before the alleged arson, he continued to sell drugs from that location. Scott stated that although defendant always had money in his pocket, defendant did not offer him money or supplies with which Scott could burn the building. Finally, Scott stated he did not know that defendant did not own the building.

Kenneth Campbell testified that the building was owned by an absentee landlord, Mr. Schavin. Campbell stated that he was going to replace defendant as the building manager at 4109 West Madison once a community group rented the entire building.

Campbell testified that there had been a fire in the building about a week before the alleged arson. Campbell had a conversation with defendant shortly thereafter in which Campbell told defendant that he did not think the fire was accidental and defendant replied that "he would not have that problem anymore." On August 8, 1986, Campbell went to the building upon hearing of the fire. Campbell heard someone say that a body was being brought out of the building and went to the back of the building. Campbell found out that the body was that of Bill Coney, whom Campbell knew. Over defendant's objection, Campbell further testified that he saw defendant at the scene of the fire and told defendant that he knew defendant was responsible for the fire.

George Newby, Jr., testified that he was a tenant of the building at the time of the alleged arson. He also testified that about a week before the alleged arson, defendant had turned off the electricity in the building and that power was later restored. Between the time the power was restored and the alleged arson, Newby, Jr., his father and several other tenants were told by defendant that "all you sons of bitches are going to roast." Newby, Jr., further stated that he saw defendant and Robert Divine leave the building at some time between 1 and 1:30 a.m. the night of the alleged arson. On cross-examination, Newby, Jr., testified that the electricity in the building was not very good.

George Newby, Sr., testified that in August 1986, he was a tenant of 4109 West Madison, living with his son. On August 8, 1986, he saw defendant shut off the lights in the building by unscrewing a fuse in a utility closet on the second floor of the building. Newby, Sr., called the police; following their arrival, Newby, Sr., restored the lights by replacing a fuse in the fusebox. Later that evening, Newby, Sr., and several other tenants were told by defendant that defendant had shut the

lights off again and offered to turn them back on for $20 dollars. Newby, Sr., refused, at which time defendant said "I will fry all you so and so's." Newby, Sr., then placed these events as happening the evening of August 7, 1986, the day before the alleged arson. At approximately 2 a.m. the following morning, Newby, Sr., woke up because Robert Divine was shouting that there was a fire.

Newby, Sr., further testified that the owner of the building, Mr. Schavin, had told him not to pay rent for a few months prior to the alleged arson because the building was to be turned over to Butch Campbell and the existing tenants would have to move. Defendant had advised Newby, Sr., to buy fire insurance about two or three months prior to the alleged arson.

Robert Divine then testified that he was defendant's stepbrother. In August 1986, he had lived at 4109 West Madison rent-free and believed that defendant owned the building. Divine further believed that defendant was a roofer and contractor and was unaware that defendant was dealing drugs. According to Divine, on August 8, 1986, at about 1 a.m., he awoke in his second-floor room and went to the washroom. Returning to his room, he heard a crackling coming from the utility closet, but did not look inside the closet, believing the noise to be rats. About 15 minutes later, Divine smelled smoke. Looking out into the hall, Divine saw fire coming out of the utility closet and began shouting fire and warning everyone to leave the building.

Divine then testified that he did not start the fire and had no idea how it started. Then Divine testified that from 6 a.m. to midnight the following day, he had spoken with the police about the fire, taken a polygraph, spoken further to the police and later he gave a written statement to a State's Attorney. This written statement was ruled admissible as substantive evidence, pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1). At this point, the trial was continued to the following day, in order that Divine could be represented by his attorney.

THE VOLUNTARINESS HEARING

The next day, the court held a hearing to determine whether Divine's written statement was voluntarily made. Divine was recalled and testified that he wished to change his prior testimony to reflect that he did know that defendant was selling drugs from 4109 West Madison. After the State granted Divine immunity from prosecution for perjury, Divine again testified that he gave the written statement to a State's Attorney.

The written statement indicated that Divine had been read and understood his constitutional rights. Divine's statement indicated that defendant dealt drugs from the building, had demanded money from the tenants to restore their electricity and was going to be replaced as the manager of the building. Divine stated that at about 9:30 p.m. the night of the alleged arson, defendant told him not to remain in the building that night because there was going to be trouble, but also asked him to return to the building later that night.

Divine then stated that around 11:30 p.m., defendant told him that he owed defendant for allowing him to stay in the building rent-free and for providing him with transportation money back and forth to school. Defendant told Divine that he was going to start a small fire in the building and needed Divine's help. According to Divine's statement, defendant and Divine went to a gas station to buy some Ronson lighter fluid, which defendant had stated was smokeless, odorless and could not be detected once ignited. The two men returned to 4109 West Madison at about 1 a.m. and climbed the back stairs of the building. Divine then saw defendant go to the second-floor utility closet, pour the lighter fluid inside the closet, ignite the fluid and throw the bottle into the flames. Defendant told Divine to wait five minutes before putting out the fire. When Divine attempted to extinguish the fire, he could not do so. Defendant had already left the area. Divine attempted to warn the other tenants of the fire.

Divine's statement also indicated that defendant had told Divine that defendant wanted to start the fire to get back at Butch Campbell. Defendant chose the utility closet because George Newby, Sr., had been messing with some of the fuses in the closet.

On cross-examination, Divine testified that he had made up the written statement because while in police custody, the police had told him that defendant had given them a statement implicating only Divine and had further told him that he had "flunked" the polygraph. The trial court asked whether the polygraph test pertained to Divine's story that he thought he had heard rats in the utility closet, which Divine confirmed. Divine further testified that he made another written statement while in the lockup at 26th and California with defendant. This second written statement indicated that Divine had accidentally started the fire and had made up the first written statement. However, Divine then testified that the second written statement was also incorrect; he had not started the fire and did not know who had.

The trial court found that the first written statement given to the State's Attorney was made voluntarily and therefore could be considered as substantive evidence.

THE TRIAL RESUMES

The parties stipulated that the building at 4109 West Madison was owned by Leonard Schavin, that William Coney died of carbon monoxide poisoning, and that samples taken from the fire source indicated the presence of an accelerant.

Detective Lawrence Gates, a member of the Chicago police department's bomb and arson unit for nine years, testified that the fire was not accidentally caused. The fire did not originate in the fusebox, but from the ignition of a flammable liquid poured on the closet floor.

Detective Dennis Keane testified that he had spoken to a number of the tenants at the scene and asked both defendant and Divine to come down to the police station for questioning. Keane stated that both men were given polygraph tests. Defendant's objection to the introduction of testimony concerning the results of any such polygraph was sustained.

Detective Ross Horne testified that he had spoken with defendant at the police station. Horne testified that defendant stated that Divine told defendant that he wanted to set fire to a woman's door with gasoline. Defendant told Horne that he advised Divine to set a fire in the utility closet, but to close the closet door so there would be smoke, but no one would be hurt. Defendant further told Horne that he rented the building from Mr. Schavin and that he was a little upset at being ousted as manager of the building.

Gloria Avery, defendant's wife, testified that the evening before the fire, she was at home at 4036 West Madison with defendant and their three sons. According to his wife, defendant came home around 9:30 or 10 p.m., had dinner, watched wrestling with his sons, took a bath and went to bed. Later, she heard a commotion and went to their back door, from which she could see the fire. Defendant's wife returned to bed, not realizing the fire was at 4109 West Madison. Subsequently, two men from a board-up company came to the door, asking her to tell defendant that 4109 West Madison was on fire. She awakened defendant and both of them went to the scene of the fire.

Defendant's three sons, Jesse Walker, Ebenious Walker and Christopher Walker, all gave substantially similar testimony. Jesse Walker testified that the night before the fire, defendant watched wrestling with him, took a bath and then went to bed some time after 10:30 p.m., the same time as the rest of the family. Jesse Walker further testified that he knew where defendant was, even though he was asleep in the room next to defendant's room. Ebenious Walker testified to the same sequence of events. Ebenious did not claim to know

where defendant was while he was asleep, but did not remember which day of the week the fire occurred. Christopher offered the same sequence of events as well. Christopher could not remember the date of the fire or what day of the week it occurred. Christopher testified that he knew where defendant was while he was asleep, because he could always hear someone leaving by the front door.

Grover Doyle testified that he was a tenant of 4109 West Madison at the time of the fire, had known defendant for about 20 years and had been a foreman for defendant's roofing business for three or four years. During the end of July or the beginning of August of 1986, Doyle helped George Newby, Sr., fix the lights in 4109 West Madison. According to Doyle, defendant told them at that time that they would get all burned up messing with that electricity. The night of the fire, a lady awakened Doyle and he was able to escape from the building. Doyle could not remember what time he went to bed that evening because he was high, but testified that he awoke at about 1:30 or 2 a.m.

Finally, John Jordan, who was also a tenant at the time of the fire, testified that the morning before the fire, defendant advised him to stay out of the building that evening because he had not paid rent for eight months. Jordan did stay in the building, though, and escaped after being awakened by Robert Divine. Jordan did not see defendant at the scene of the fire.

Following closing arguments, the trial court found defendant guilty of two counts of murder and one count of aggravated arson. Defendant was sentenced to 40 years' imprisonment.

## I

On appeal, defendant first contends that he was denied a fair trial because the trial court improperly admitted and considered evidence of other crimes allegedly committed by defendant. In particular, defendant objects to testimony alleging that: (1) defendant ran a drug dealership from 4109 West Madison; (2) a fire separate from the alleged arson occurred about one week prior to the alleged arson; and (3) defendant attempted to extort money from the tenants of the building in return for the restoration of electricity to the building.

The State initially contends that defendant waived the issue by failing to object at trial and to include the alleged error in his post-trial motion. (*People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d 1091, 1093.) Supreme Court Rule 615(a), however, provides an exception to the rule of waiver where there has been "plain error." (107 Ill. 2d R. 615(a).) Under this rule, this court may elect to consider errors that have not been properly preserved for review where the evidence

at trial is closely balanced or where the errors were of such magnitude that a defendant was denied a fair trial. (*Lucas*, 88 Ill. 2d at 250-51, 430 N.E.2d at 1093-94.) In this case, due to the prejudicial effect such evidence may have on the trier of fact, we turn to consider defendant's arguments. See *People v. Alford* (1982), 111 Ill. App. 3d 741, 744, 444 N.E.2d 576, 578.

Although evidence of other crimes is inadmissible to prove a defendant's predisposition to commit the crimes charged, it may be admitted if it is relevant for any other purpose. (*People v. Stewart* (1984), 105 Ill. 2d 22, 61-62, 473 N.E.2d 840, 868.) Of course, there must be some evidence that the alleged other crime was actually committed. (*People v. Gugliotta* (1980), 81 Ill. App. 3d 362, 365, 401 N.E.2d 262, 264.) The decision to admit or exclude evidence of other crimes rests within the discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Chambers* (1989), 179 Ill. App. 3d 565, 577, 534 N.E.2d 554, 560.

Moreover, the trial judge in a bench trial is generally presumed to have considered only properly admitted evidence. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347.) Likewise, when evidence is admissible for a limited purpose, it is presumed that the trial judge considered it only for that proper purpose. (See *People v. Lewis* (1986), 147 Ill. App. 3d 249, 258, 498 N.E.2d 1169, 1176.) Where the evidence of defendant's guilt is manifest, the defendant must be able to show more than a mere suspicion to rebut these presumptions. (See *People v. Brock* (1989), 184 Ill. App. 3d 595, 599, 540 N.E.2d 554, 556.) Indeed, these presumptions are only rebutted when the defendant can make an affirmative showing to the contrary from the record on appeal. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 258, 369 N.E.2d 849, 852.) Once a defendant has been found guilty after a bench trial, all evidence is to be construed in the light most favorable to the prosecution. *People v. Schuld* (1989), 191 Ill. App. 3d 809, 812, 548 N.E.2d 336, 338.

■ In this case, the State's theory at trial was that defendant, as the manager of 4109 West Madison, considered himself the "boss hog" of the building. The record shows that defendant was to be replaced as manager of the building and that the tenants had been instructed not to pay rent to defendant because they were to be relocated. Thus, evidence that defendant stood to lose any profit generated from alleged drug-dealing or extortion at 4109 West Madison was admissible to show the motives of economic loss and vengeance against the building's owner and those tenants whom defendant could no longer control.

Even if this evidence was deemed inadmissible, the error would not mandate reversal in this case. The record shows that the trial court affirmatively stated that it would not consider the evidence of drug dealing in reaching its decision. Similarly, defendant has failed to indicate from the record that the trial court improperly considered the testimony of alleged extortion in reaching its decision. Hence, defendant has failed to rebut the presumption that it was not improperly considered.

Defendant also objects to the introduction of evidence of a fire which occurred at 4109 West Madison about one week before the alleged arson, not only because it was inflammatory, but also because there was no evidence that the prior fire was an arson. The record here shows that when the defendant objected to this testimony, the trial court stated:

"Subject to my seeing the relevancy, so far I don't, it may come a time when I sustain the objection but at this time I want to hear the testimony."

The record also shows that the trial court later refused to admit evidence of a report concerning the prior fire which defense counsel characterized as a "report of an accidental fire," advising defense counsel not to "open up a can of worms here." The record further indicates that just before the defense rested, defense counsel attempted to have the State stipulate that the prior fire was an accidental stove fire. At that time, the trial court rejected the State's argument that the evidence could show a pattern of fires, remarking that there was "no inference one way or another as to what caused the earlier fire." Therefore, although the trial court may have initially treated evidence of the prior fire as conditionally relevant, the record indicates that it ultimately did not consider evidence of the prior fire in reaching its verdict because the State failed to demonstrate its relevance to the charged offenses.

In sum, defendant has failed to overcome the presumption that the trial court considered only proper evidence for proper purposes. *Lewis*, 147 Ill. App. 3d at 258, 498 N.E.2d at 1176.

## II

Defendant's second argument on appeal is that the trial court improperly considered evidence that Robert Divine and defendant took polygraph tests and evidence that Divine "flunked" his polygraph. Again, the State contends that defendant has waived the issue by failing to object at trial and to include the alleged error in his post-trial motion. (*Lucas*, 88 Ill. 2d at 250, 430 N.E.2d at 1093.) However, be-

cause the use of polygraph evidence may rise to the magnitude of plain error (*People v. Yarbrough* (1982), 93 Ill. 2d 421, 426, 444 N.E.2d 493, 495; *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070), this court will review defendant's argument.

In *Baynes*, our supreme court held polygraph evidence inadmissible even in the face of a written stipulation. (*Baynes*, 88 Ill. 2d at 240, 430 N.E.2d at 1077.) The court expanded on *Baynes* in *Yarbrough*, stating that such evidence could not be considered even when the trier of fact is a judge. *People v. Yarbrough* (1982), 93 Ill. 2d 421, 427, 444 N.E.2d 493, 495.

Nevertheless, the case law suggests that the prohibition on polygraph evidence is not absolute. For example, in *People v. Triplett* (1967), 37 Ill. 2d 234, 226 N.E.2d 30, our supreme court recognized that although Illinois law manifests a strong aversion to the admissibility of polygraph evidence, "it can be argued that a different result should follow when the issue is the voluntariness of a confession." (*Triplett*, 37 Ill. 2d at 239, 226 N.E.2d at 32.) The court further stated that "[i]t can be said that the fact that the confession followed a polygraph examination is a relevant circumstance and that it is the fact of the examination, rather than its result, that is significant." (*Triplett*, 37 Ill. 2d at 239, 226 N.E.2d at 32.) The court held, however, that because no limiting instruction was given to the jury, a new trial was required regardless of whether or not the evidence was admissible. *Triplett*, 37 Ill. 2d at 240, 226 N.E.2d at 33.

This court has allowed evidence of a polygraph examination on the question of voluntariness where a limiting instruction was given to the jury, even after *Baynes* and *Yarbrough* were decided. (*People v. Jackson* (1990), 198 Ill. App. 3d 831, 846, 556 N.E.2d 619, 628-29; see also *People v. McClellan* (1991), 216 Ill. App. 3d 1007, 1012-13 (distinguishing *Jackson* as a case involving voluntariness).) This court has also approved a trial judge's consideration of polygraph evidence relating to voluntariness in the context of a motion to suppress. *E.g., People v. Hattery* (1989), 183 Ill. App. 3d 785, 822-23, 539 N.E.2d 368, 393; *People v. Haymer* (1987), 154 Ill. App. 3d 760, 772-73, 506 N.E.2d 1378, 1386-87.

■ Defendant argues that *Baynes* and *Yarbrough* should apply because the trial judge heard Divine testify that the police told Divine that he flunked the polygraph and that the trial judge asked about which statements the polygraph test addressed. The record indicates that these events took place in the context of a hearing to determine whether Divine's first written statement, which was otherwise admissible as substantive evidence, should be suppressed as being coerced

by the police.[1] During this hearing, the trial judge heard that Divine had been told by the police that Divine had flunked his polygraph examination. This case, then, is similar to *Jackson*.

Unlike *Jackson*, however, the trial judge here also asked Divine whether he had told the polygraph examiner that Divine attributed the crackling sound in the hall to rats in the utility closet. Nevertheless, whether Divine told the polygraph examiner the same story initially told at trial is probative of voluntariness. At the time the trial judge asked this question, Divine had told the "rat story" at trial. The trial judge had not yet heard the version Divine told after being placed in the lockup with defendant. Therefore, if the version told to the polygraph examiner was the "rat story," matching Divine's trial testimony at that point, the version related by the written statement would appear to be inconsistent, possibly suggesting that the written statement was coerced. It is therefore not necessary to infer that the trial judge was inquiring into the truthfulness, rather than the voluntariness, of the statement.

Moreover, this case is a stronger one for admissibility than *Jackson* because it was a bench trial, rather than a jury trial. The trial judge is presumed to consider admissible evidence only, and to consider evidence introduced for a limited purpose for that proper purpose only. (*Lewis*, 147 Ill. App. 3d at 258, 498 N.E.2d at 1176.) In this case, we have more than these presumptions upon which to rely. We have the record, which indicates that the trial judge both stated during the voluntariness hearing that he could not consider polygraph evidence in reaching a judgment on the merits and sustained defendant's objections to the introduction of such evidence when the trial on the merits resumed. Thus, the record does not remove this case from the scope of *Jackson*.

It is this record which also distinguishes this case from *Yarbrough*. In that case, the trial court violated State law by *suggesting* that a defendant take a polygraph and subsequently asked counsel whether there was new evidence beneficial to the defendant. Our supreme court inferred from those facts that the trial court improperly considered polygraph evidence in deciding the sufficiency of the evidence. (*Yarbrough*, 93 Ill. 2d at 427-28, 444 N.E.2d at 495-96.) Thus,

---

[1]The trial court cited *People v. Bacon* (1971), 2 Ill. App. 3d 324, 276 N.E.2d 782, as authority for holding a hearing on whether the statement of one in the position of a codefendant or co-indictee should be suppressed. Neither side has raised any issue regarding this ruling on appeal.

the presumptions that the trial court knew the law and only considered admissible evidence were successfully rebutted.

In this case, defense counsel first elicited polygraph evidence during the hearing, not the trial judge. The testimony elicited by defense counsel and the trial judge was introduced to determine the voluntariness of a witness' written statement, not the sufficiency of the evidence of defendant's guilt. Consequently, this case is not controlled by *Yarbrough*.

The rule against admitting polygraph evidence is premised on two concerns: (1) such evidence is unreliable and thus infringes on the integrity of the judicial process; and (2) such evidence may appear to a jury as being completely determinative of guilt. (See *Baynes*, 88 Ill. 2d at 244, 430 N.E.2d at 1079.) Here, where a trial judge has merely heard polygraph evidence on the question of voluntariness during a motion to suppress, then hears the bench trial concerning the same defendant and states during the latter that he will not consider polygraph evidence adduced at the former, these concerns are not implicated. Given these circumstances, the trial court did not commit reversible error.

### III

Defendant's third argument is that the trial court improperly conducted an investigation into matters outside the trial record. The State contends that defendant waived the issue by failing to object at trial and to include the alleged error in his post-trial motion. (*Lucas*, 88 Ill. 2d at 250, 430 N.E.2d at 1093.) The error defendant alleges goes to his constitutional right that all proceedings against him shall be open and notorious, and in his presence. Any inquiry or acquisition of evidence outside of open court and outside of the presence of the defendant is prejudicial error. (*People v. Rivers* (1951), 410 Ill. 410, 416, 102 N.E.2d 303, 306.) This court, as a result, will review such alleged errors under Rule 615(a). *People v. Brantley* (1976), 43 Ill. App. 3d 616, 618, 357 N.E.2d 105, 107.

Defendant likens his case to *People v. Harris* (1974), 57 Ill. 2d 228, 314 N.E.2d 465. In *Harris*, the trial judge stated that he could not believe the defendants' alibi because they relied on alleged facts that they apparently had not told their defense counsel during their initial meeting and these facts had not been mentioned in a related case heard by the same trial judge. Our supreme court reversed the convictions, holding that the record did not allow the presumption that the trial judge considered only admissible evidence. *Harris*, 57 Ill. 2d at 231-32, 314 N.E.2d at 467.

In this case, defendant asserts that "[a]fter the evidence was closed, the trial court demanded that the lawyer for the defendant provide certain information about the time defendant first asserted an alibi defense, and inquired if there were any police reports indicating that the alibi witnesses went to the police station and related the alibi." Defendant contends that "where the judge inquired about the timeliness of the alibi, as his own private investigation, and then stated that he did not believe the alibi witnesses or any thing they said, *** the conviction must be reversed and the case remanded for a new trial."

■■ The record in this case indicates that during closing arguments, defense counsel stated that it would have been very easy for her to tell the alibi witnesses the date of the fire and what time the firemen said the fire started. The record shows that it was at this point that the trial judge asked the "personal question" of when defendant's trial counsel first asked the alibi witnesses where they were and who was present on the date at issue. Defense counsel replied that she had not asked those questions until that very day, upon which the trial judge inquired whether there were any police reports in which the family members mentioned the alibi to which they had just testified one year and nine months following the alleged arson. The record does not indicate that this question was answered. The record later reflects that the court remarked that the alibi could be fabricated and further stated:

"I can't believe what they testified to as being something which they can remember and relate. That the way in which they testified, the manner in which they testified, the questions which were asked, their reasons for remembering fall way short of what I think is needed to make this an alibi or to overcome the evidence that the State—to me the overwhelming evidence introduced by the State."

The record reflects that the trial court chose to disbelieve the alibi witnesses on the grounds that they were family members who did not want to see defendant convicted and that their testimony was not convincing.

This case does resemble *Harris* insofar as the trial court asked defense counsel about matters which ultimately bear on the credibility of an alibi defense. However, based on the record, this case is distinguishable from *Harris*. First, in *Harris*, the trial court initiated an investigation of matters not in evidence in one charge based on the judge's knowledge of a related charge. (*Harris*, 57 Ill. 2d at 231-32, 314 N.E.2d at 467.) In contrast, the record here shows that the

judge's "personal questions" were provoked by the argument of defense counsel that the alibi witnesses did not fabricate their testimony. In *Harris*, the trial court concluded that the defendants were not credible because he could not ascertain whether they had mentioned their alibi in their first meeting with the public defender. In this case, the trial judge appears to have based his conclusion upon the substance of the testimony and his observation of the witnesses' demeanor, not on information obtained in another judicial proceeding. Even if we were to deem the trial judge's question concerning police reports to be problematic, defendant has not indicated that this question was answered or demonstrated that any answer given would have been anything more than cumulative to what the trial judge had already seen and heard. Thus, the trial judge's questions do not require reversal.

## IV

Defendant's final argument is that the State failed to prove him guilty beyond a reasonable doubt. Defendant contends that his case turns on credibility and that Divine's credibility was sorely damaged, making it doubtful that defendant set the fire.

This court will not reverse a criminal conviction unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. (*E.g., People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.) The relevant inquiry on appeal is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, after viewing the evidence in the light most favorable to the prosecution. *People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.

The testimony of an accomplice, whether corroborated or not, may be sufficient to sustain a conviction if the trier of fact is convinced beyond a reasonable doubt. (See, *e.g., People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375.) However, accomplice testimony is often problematic; the accomplice may have been promised leniency or harbor bias against the accused. Consequently, such testimony should be accepted with the utmost caution and be subjected to the highest scrutiny. (*Newell*, 103 Ill. 2d at 470, 469 N.E.2d at 1377; see *People v. Krankel* (1985), 131 Ill. App. 3d 887, 476 N.E.2d 777.) Nevertheless, whether accomplice testimony forms a sufficient basis for conviction ultimately goes to the weight of the evidence; therefore, it is generally a function within the province of the trier of fact. See *Newell*, 103 Ill. 2d at 470, 469 N.E.2d at 1377.

■■ In this case, the finder of fact chose to believe Divine's first written statement, which directly implicated defendant in the charged offenses. Divine was not offered leniency with regard to the charged offenses; the record reflects that Divine's arrest had been quashed previously. Indeed, the record reflects that Divine was offered immunity for perjury before he denied the truthfulness of his first written statement, not before he made the written statement itself. The record further reflects that the trial court was aware of the suspicion with which Divine's statements should be viewed, declaring:

> "Certainly the State would rather have a pope or a priest to be present, but popes and priests and lawyers and doctors and Indian chiefs do not go out and burn buildings down.
>
> So the best the State could do was to produce someone who was there present and viewed the whole circumstances, corroborated by the physical facts. None of the alibi witnesses do anything to deter the proof presented by the state which does convince me beyond a reasonable doubt that the defendant *** is guilty ***."

Divine's first written statement was consistent with the testimony of Detective Gates that the physical evidence led Gates to conclude that the fire was caused by the igniting of an accelerant poured inside the electrical closet. It is also consistent with the testimony of George Newby, Jr., that he saw defendant at 4109 West Madison on the night of the fire between 1 and 1:30 a.m. and that he previously heard defendant tell a number of tenants that "all you sons of bitches are going to roast." It is consistent with George Newby, Sr.'s testimony that defendant told the tenants that "I will fry all you so and so's." It is consistent with Benjamin Scott's testimony that defendant had previously offered him $5,000 to burn the building down and that about a month before the fire, defendant told the tenants to buy fire insurance.

Divine's first written statement is not consistent with the alibi testimony of defendant's wife and children. The trial judge noted on the record that he found the alibi testimony vague and also remarked upon the demeanor of the alibi witnesses. The trial judge's comments in this regard find support in the record; for example, the children testified that they knew defendant did not leave their home that night, even though they were asleep in a room separate from defendant.

In sum, viewing the evidence in the light most favorable to the prosecution, the trial court's reliance on the first written statement Divine gave to the police was consistent with the testimony of numer-

ous witnesses; Divine's other versions of events were not. The opposing testimony was primarily given by members of defendant's family, who lacked credibility and had an obvious desire to see the head of the family escape punishment. Given this record, the trial court could have found defendant guilty beyond a reasonable doubt.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.